THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT BUT IS SUBJECT TO A HEARING TO DETERMINE ITS ADEQUACY FOR SOLICITATION OF VOTES ON THE PLAN.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| IN RE: | ) CHAPTER 11 |
| | ) |
| AEROSOL PACKAGING, LLC, | ) CASE NO. 06-67096-MHM |
| A Georgia Limited Liability Company | ) |
| d/b/a AEROSOL SPECIALTIES, | ) |
| | ) |
| Debtor. | ) |

## DISCLOSURE STATEMENT FOR DEBTOR'S
## FIRST AMENDED PLAN OF REORGANIZATION

### SEPTEMBER 29, 2006

NOTWITHSTANDING ANYTHING IN THIS DISCLOSURE STATEMENT TO THE CONTRARY, THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE FIRST AMENDED PLAN OF REORGANIZATION OF THE DEBTOR AT THIS TIME.  NEITHER ACCEPTANCES NOR REJECTIONS OF THE PLAN MAY BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION ("BANKRUPTCY COURT"). THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.  INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION AND AMENDMENT.  A COMPLETE COPY OF THE PLAN IS ATTACHED AS EXHIBIT A.

The Bankruptcy Court has set ___TBD___ prevailing Eastern Time on ___TBD___, 2006, in Courtroom 1204, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia 30303, as the time, date and place for the hearing on Confirmation of the Plan.

### JAMPOL, SCHLEICHER, JACOBS & PAPADAKIS, LLP
Brian L. Schleicher
11625 Rainwater Drive
Suite 350
Alpharetta, GA 30004
(770) 667-1290

### Counsel to Aerosol Packaging, LLC

**[Page Intentionally Left Blank]**

# TABLE OF CONTENTS

**Page**

I.    OVERVIEW OF THE PLAN.................................................................................1

II.   INTRODUCTION .........................................................................................8

III.  SUMARY EXPLANATION OF CHAPTER 11 AND PLAN CONFIRMATION ......11

IV.   INFORMATION ABOUT THE DEBTOR.....................................................13
    A.    Debtor's History and Background                     13
    B.    Claims Against Debtor                               19
    C.    Assets of Debtor                                    22
    D.    Ownership of Debtor                                 27
    E.    Management of Debtor                                27
    F.    Industry and Competition                            29

V.    SIGNIFICANT EVENTS SINCE FILING OF PETITION.................................32
    A.    Use of Cash Collateral; Post Petition Financing     32
    B.    Payment of Prepetition Claims                       32
    C.    Appointment of Community Bankruptcy Liaison         33
    D.    Appointment of Creditors Committee and its Professionals   33

VI.   HARBERT PRIVATE EQUITY FUND II, LLC ...........................................33

VII.  THE PLAN ...............................................................................................34
    A.    Concept of the Plan                                 34
    B.    Treatment of Unclassified Claims                    35
    C.    Classification and Treatment of Claims and Interests   36
    D.    Alternative Treatment for Certain Secured Creditors 41
    E.    Treatment of Executory Contracts and Unexpired Leases  43
    F.    Means for Implementation of the Plan                45

VIII. PLAN ANALYSIS........................................................................................49
    A.    Claims Analysis and Projected Distributions         49
    B.    Liquidation Analysis/Alternatives to the Plan       51
    C.    Feasibility Analysis                                54
    D.    Tax Consequences                                    54

IX.   SOLICITATION OF ACCEPTANCES; CONFIRMATION HEARING...................54

X.    CONCLUSION ...........................................................................................55

**[Page Intentionally Left Blank]**

Aerosol Disclosure Statement for Plan.5.3.DOC

## I.   OVERVIEW OF THE PLAN

**THIS OVERVIEW IS PROVIDED AS A SUMMARY OF THE FIRST AMENDED PLAN OF REORGANIZATION FILED BY DEBTOR (THE "PLAN") WHICH IS DISCUSSED IN MORE DETAIL IN THIS DISCLOSURE STATEMENT.  A COPY OF THE PLAN IS ATTACHED AS EXHIBIT "A" TO THIS DISCLOSURE STATEMENT. THE OVERVIEW BY ITS NATURE IS SUPERSEDED BY THE PROVISIONS OF THE PLAN.  ALL DEFINED TERMS USED IN THIS OVERVIEW HAVE THE DEFINITIONS ASSIGNED TO THEM IN THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST REVIEWING THIS OVERVIEW SHOULD REFER TO THE REMAINDER OF THIS DISCLOSURE STATEMENT AND THE PLAN FOR A COMPLETE UNDERSTANDING OF THE PLAN AND ITS EFFECT ON DEBTOR'S ASSETS, AND CLAIMS OF CREDITORS AND EQUITY INTERESTS.**

The Plan contemplates the sale of substantially all of Debtor's assets and business at its present location in Canton, Georgia to Harbert Private Equity Fund II, LLC ("Harbert"), or its designee (the "Buyer").  Certain critical vendors have entered into Forbearance Agreements with Debtor during the prepetition period under which such Forbearing Vendors agreed, in general, to defer a portion of their prepetition claims for a period of up to 13 months while continuing to provide new payment terms for new goods and services provided to Debtor during the forbearance period.  Without the continuation of an uninterrupted flow of these goods and services Debtor's business operations will be materially and adversely affected thereby reducing the likelihood that a sale of Debtor's assets would be consummated.   At the Closing of the sale, Buyer shall:

(1)      deliver to Debtor cash in an amount equal to $3,300,000 for deposit into a Plan Fund maintained by Debtor for payment of Allowed Claims of Creditors, including a portion of the claims of  Forbearing Vendors (estimated at approximately $565,000) whose Forbearance Agreements are assumed by Debtor and assigned to Buyer,

(2)      assume the balance of the Allowed Claims of the Forbearing Vendors whose Forbearance Agreements are assumed and assigned to Buyer, the balance of which are not contemplated to be paid out of the Plan Fund (estimated at approximately $1,133,000),

(3)      in the event Debtor elects to assume and assign the Real Property Lease to Buyer, deliver to Debtor cash for the Real Property Cure Amount necessary to cure any default under the Real Property Lease (the amount claimed by the Landlord to be owed in the pre-petition period for unpaid rent and other charges is approximately $598,000), to be deposited by Debtor into an escrow account maintained with the Debtor's counsel for payment to the Landlord, subject to any offset for counterclaims that Debtor may have against Landlord (the final Allowed Claim will be deposited into the Plan Fund for payment to Landlord, if appropriate),

(4)      deliver to Debtor cash in the amount necessary to cure any other Executory Contracts or Unexpired Leases (other than the Forbearance Agreements or the Real

- 1 -

Property Lease) that Debtor will assume and assign to Buyer (pursuant to the Asset Purchase Agreement) for deposit into the Plan Fund, and

(5)      deliver to certain specifically identified creditors that accept the treatment offered to them, non-interest bearing contingent promissory notes in the aggregate amount not to exceed $400,000.

In addition, pursuant to an order of the Bankruptcy Court, Debtor was authorized to enter into, and Harbert has agreed to provide, post-petition financing to Debtor of an amount up to $1,000,000 during the pendency of Debtor's bankruptcy case (which amount could increase at the election of Harbert to $2,000,000 if certain conditions are satisfied).   Any amount outstanding under the post-petition financing at the time of the Closing of the sale of Debtor's Assets and business to Buyer shall be converted by Harbert into equity in Buyer.

### Unclassified Claims

In accordance with §1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Priority Tax Claims (the "Unclassified Claims") have not been classified into classes for purposes of voting on the Plan.  The Unclassified Claims shall be paid first by Debtor on the Distribution Date out of cash available in the Plan Fund.  Presently it is estimated that the Allowed Claims of these Unclassified Claims will total between $300,000 and $500,000, and such total is subject to change as proofs of claim are filed with the Clerk of the Court, are reviewed and/or objected to by Debtor, and a final determination as to their allowance is made.  In addition, in the event that Debtor elects to assume any Executory Contracts or Unexpired Leases, Debtor will be obligated to cure any monetary defaults thereunder as a condition to such assumption which approved amounts will be paid out of the Plan Fund.  See Article VII, Section E of this Disclosure Statement for a discussion of how these claims will be handled.  The actual amount to be paid for Unclassified Claims is subject to Bankruptcy Court approval.

### Classified Claims and Interests

The following chart summarizes the claims of creditors and equity interests that are not otherwise characterized as "Unclassified Claims," and is provided for your assistance in analyzing the Plan.  Classified Claims and Interests are divided into 7 classes as set forth below:

| Class | Members of Class | Treatment Under the Plan | Estimate of Allowed Claims in Class (1) |
|---|---|---|---|
| 1 | All Holders of Allowed Claims that are entitled to priority pursuant to § § 507 (a) or (b), to the extent they are not otherwise an Unclassified Claim | Paid in full out of the Plan Fund on the Distribution Date or when the respective Claims become Allowed Claims | $25,000, however the actual amount is unknown at this time |

- 2 -

| 2 | Wachovia Bank, N.A. | $1,800,000 paid on the Distribution Date from the Plan Fund and any remaining Allowed Claims shall be waived. If Wachovia does not consent to this treatment then Debtor will offer alternative treatment for Wachovia's Allowed Secured Claim (as determined by the Bankruptcy Court) which will be satisfied by the issuance of a promissory note that will be assumed by Buyer, payable quarterly over 7 years bearing interest at a rate of 9% per year with any balance of Wachovia's Allowed Claim included as an Unsecured Claim in Class 6. | $2,827,000 |
| 3A | Blue Ridge Investors II, LP | On the Distribution Date, Buyer shall deliver a non-interest bearing three-year contingent promissory note payable to Blue Ridge for the principal amount equal to the product of (1) $400,000 multiplied by (2) the fraction equal to (i) the amount of the Allowed Claim of Blue Ridge in Class 3A divided by (ii) the sum of the Allowed Claims of Holders in Class 3A and Class 3B; which note shall be payable at 25% of the Free Cash Flow of Debtor's business acquired by Buyer (pro-rata with the Allowed Claim of Class 3B if (x) such Free Cash Flow is insufficient to pay the Class 3A and Class 3B claims in full, and (y) the Holder of Class 3B accepts the treatment proposed for Class 3B), for each calendar year (or partial year if less than a complete calendar year). If Blue Ridge does not consent to this treatment then Debtor will offer alternative treatment for Blue Ridge's Allowed Secured Claim (as determined by the | $3,558,000 |

| | | | |
|---|---|---|---|
| | | Bankruptcy Court) which will be satisfied by the issuance of a promissory note that will be assumed by Buyer, payable quarterly over 7 years bearing interest at a rate of 9% per year, with any balance of Blue Ridge's Allowed Claim included as an Unsecured Claim in Class 6. | |
| 3B | Geneva Associates Merchant Banking Partners I, LLC | On the Distribution Date, Buyer shall deliver a non-interest bearing three-year contingent promissory note payable to Geneva for the principal amount equal to the product of (1) $400,000 multiplied by (2) the fraction equal to (i) the amount of the Allowed Claim of Geneva in Class 3B divided by (ii) the sum of the Allowed Claims of Holders in Class 3A and Class 3B; which note shall be payable at 25% of the Free Cash Flow of Debtor's business acquired by Buyer (pro-rata with the Allowed Claim of Class 3A if (x) such Free Cash Flow is insufficient to pay the Class 3A and Class 3B claims in full, and (y) the Holder of Class 3A accepts the treatment proposed for Class 3A), for each calendar year (or partial year if less than a complete calendar year). If Geneva does not consent to this treatment then Debtor will offer the alternative treatment of including Geneva's Allowed Claim as an Unsecured Claim in Class 6. | $1,365,000 |
| 4 | Badger Capital I, LLC | On the Distribution Date, Badger Capital shall receive a Distribution of $150,000 in cash payable from the Plan Fund and the balance of its Allowed Claim shall be waived. If Badger Capital does not consent to | $247,000 |

- 4 -

| | | this treatment then Debtor will offer alternative treatment for Badger Capital's Allowed Secured Claim (as determined by the Bankruptcy Court) which will be paid from the Plan Fund on the later of (i) the Distribution Date, or (ii) as soon as practicable after its Allowed Secured Claim is finally determined, with any balance of Badger Capital's Allowed Claim included as an Unsecured Claim in Class 6. | |
|---|---|---|---|
| 5 | Forbearing Vendors who entered into a prepetition Forbearance Agreements with Debtor and whose agreements Debtor elects to assume under the Plan | Debtor shall pay approx. $565,000 out of the Plan Fund sixty (60) days after Closing based on the respective Forbearance Agreements, with the balance (approximately $1,133,000) assumed and assigned to Buyer and paid by Buyer pursuant to the terms of such agreements. | $1,698,000 |
| 6 | General Unsecured Creditors, including claims of unsecured trade creditors that did not enter into prepetition Forbearance Agreements with Debtor; Forbearing Vendors whom had their Forbearance Agreements Rejected by Debtor; holders of claims based on rejection of Executory Contracts; deficiency claims of creditors in Classes 2, 3A, 3B and 4 as a result of their non-acceptance of the treatment offered to them in their respective class | On the Distribution Date each Holder of an Allowed Claim in Class 6 shall receive cash from the Plan Fund in an amount equal to the lesser of (i) 20% of the amount of such Holder's Allowed Claim, or (ii) the pro-rata amount remaining in the Plan Fund after taking into account, the cash payments to be made to Holders of Unclassified Claims, cash payments necessary to cure any Executory Contracts or Unexpired Leases assumed by Debtor, and the cash payments to be made to Holders of all other Allowed Claims of Classes 1, 2, 4 and 5 (with adequate reserves being established for all of such Claims that have not been finally determined to be an Allowed Claim by the Bankruptcy Court as of the Distribution Date). | $1,973,000, exclusive of any deficiency claims of holders of Class 2, 3A, 3B and 4 which may get included in this Class if the Holders do not consent to the initial treatment offered and the Holders are given the alternative treatment provided in the Plan |

- 5 -

| 7 | Equity Interests | Holders of Equity Interests shall receive no Distributions under the Plan. | N/A |

(1) The amounts listed for each class of claims are merely estimates of the amounts expected to be included in each respective class. The bar date for Creditors to file their proof of claims has been set for September 14, 2006, therefore the amounts listed are subject to change after Debtor has the opportunity to review the proofs of claims filed and determine if it will file any objections. The final amounts for any claims objected to will be subject to final determination by the Bankruptcy Court. In addition, the final amount in Class 6 will depend on whether certain creditors in Classes 2, 3A, 3B, and 4 accept the treatment provided, or whether they reject the plan treatment and are forced to accept the alternative treatment offered by Debtor.

Debtor strongly urges you to vote in support of the Plan. Debtor believes that the Plan provides fair and equitable treatment of the Claims of its Creditors by recognizing the importance of the Forbearing Vendors in Class 5 to its continuing operations, the value of the collateral securing the Creditors' Claims in Classes 2, 3A, and 4, and the potential deficiency, if any, resulting from the amount that the Allowed Claims of the secured creditors exceed the value of the collateral securing such Claims, while providing a reasonable amount for General Unsecured Creditors in Class 6.

Debtor is of the opinion that this Plan affords the only realistic opportunity for Creditors to maximize their recoveries. Prior to the filing of its petition, Debtor spent a significant amount of time trying to identify alternative financing sources, possible investors, or prospective purchasers of its business. Harbert was the only entity that came forward with a viable plan that would result in a significant recovery for Creditors. The only other viable option available to Debtor was the cessation of its business operations and the liquidation of its assets by Debtor's senior secured lender, Wachovia Bank. If the Plan is not confirmed by the Bankruptcy Court Debtor may have to halt its operations and allow Harbert and Wachovia Bank to liquidate its Assets. If this were to happen, Debtor believes that:

(a) the value of Debtor's Assets would be materially and adversely affected thereby creating a significant deficiency in the claim of Wachovia Bank (after taking into account the payment of amounts owed to Harbert as Debtor's post-petition lender, and certain administrative claims authorized by the Bankruptcy Court when it approved the post-petition financing);

(b) Debtor's junior secured creditors and unsecured creditors would not be expected to receive any distribution in a liquidation of Debtor's Assets;

(c) the Landlord would experience a significant and material decrease in the value of its real property, and

- 6 -

(d)    Debtor's cessation of operations would have a significant negative impact on all of the employees of Debtor and the Canton, Georgia community in general.

---

**YOU ARE URGED TO STUDY THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY AND TO TIMELY VOTE YOUR CLAIM.**

**BALLOTS MUST BE <u>RECEIVED</u> BY THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, AT ROOM 1340, RICHARD B. RUSSELL FEDERAL BUILDING, 75 SPRING STREET, ATLANTA, GEORGIA 30303, ON OR BEFORE _____[TBD]_____ AT 5:00 P.M. PREVAILING EASTERN TIME TO BE COUNTED.**

**<u>DEBTOR RECOMMENDS THAT YOU VOTE IN FAVOR OF THE PLAN</u>.**

---

**[Remainder of Page Intentionally Left Blank]**

## II.    INTRODUCTION

Aerosol Packaging, LLC, a Georgia limited liability corporation, is the debtor and debtor-in-possession ("Debtor") in this chapter 11 bankruptcy case (the "Case") pending in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"). Pursuant to §1125(b) of the Bankruptcy Code, the Debtor submits the following as its disclosure statement (the "Disclosure Statement") for the First Amended Plan of Reorganization (as may be amended from time to time, the "Plan") of Debtor. This Disclosure Statement is distributed pursuant to the provisions of Section 1125 of the Bankruptcy Code. Section 1125 requires that Holders of claims and equity interests receive a copy or summary of the Plan and a written disclosure statement containing sufficient information to enable you to make an informed decision as to whether to vote to accept or reject the Plan. A disclosure statement must be approved by the Bankruptcy Court, after a notice and a hearing, prior to solicitation of acceptances for the Plan. This Disclosure Statement has been approved by the Bankruptcy Court. Court approval does not, however, constitute an endorsement by the Bankruptcy Court of the Plan or a representation of the accuracy of the information contained in this Disclosure Statement, other than that the information as presented complies with the requirements of Section 1125 of the Bankruptcy Code.

**A COPY OF THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT "A" AND IS INCORPORATED INTO THIS DISCLOSURE STATEMENT BY REFERENCE. YOU ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY AND TO STUDY THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.**

**IT IS STRONGLY SUGGESTED BY DEBTOR THAT YOU CONSULT WITH YOUR OWN LEGAL AND FINANCIAL ADVISORS WITH RESPECT TO THE LEGAL EFFECTS AND OTHER CONSEQUENCES OF THE PLAN AND ITS IMPACT UPON YOUR LEGAL RIGHTS.**

The Overview of the Plan and all other statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. In the event of any inconsistencies between this Disclosure Statement and the Plan, the terms of the Plan shall control. All statements contained in this Disclosure Statement shall be deemed to be made for settlement purposes and are inadmissible for purposes of any contested matter in this Case, or in an adversary proceeding other than the hearing on confirmation of the Plan. Terms with an initial capital not required by standard capitalization rules are defined terms, and each term not parenthetically or otherwise defined in this Disclosure Statement shall have the meaning ascribed to it in the Plan.

No representations concerning Debtor or the Plan, other than those set forth in this Disclosure Statement, are authorized or approved by the Bankruptcy Court. Any other representations or inducements to secure your vote to accept or reject the Plan should not be relied upon. The financial information contained in this Disclosure Statement has not been audited, has been derived from the books and records of Debtor and is believed to be true and accurate. Although every reasonable effort has been made to accumulate and present accurate

- 8 -

information, the accuracy of the information contained in this Disclosure Statement cannot be guaranteed. The Securities and Exchange Commission has neither approved nor disapproved this Disclosure Statement and therefore has not passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The information contained in this Disclosure Statement is made as of the date noted on the cover, unless another time is specified. Neither the delivery of this Disclosure Statement, nor any exchange of rights made in connection herewith, nor any act in reliance hereon, should create under any circumstances an implication that there has not been a change, after the date noted, in the facts underlying the statements set forth herein.

Debtor is required under Section 1122 of the Bankruptcy Code to classify Claims and Interests into classes that contain Claims and Interests that are substantially similar to other Claims or Interests in such class. While Debtor believes that it has classified the Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code, it is possible that a Holder of a Claim or Interest may object to Debtor's classification of such Holder's Claim or Interest and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intention of Debtor to modify the Plan to provide for whatever reasonable classification might be required by the Bankruptcy Court as a condition to Confirmation of the Plan as long as such classification does not materially increase the amount Buyer has offered or is required to pay for Debtor's Assets and business. Any such reclassification could, however, adversely affect the class in which such Holder of a Claim or Interest was initially a member, the class into which the Claim or Interest is placed, or other classes under the Plan, by changing the composition and structure of such class or classes.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability, or be admissible in any proceeding involving Debtor or any other party, or be deemed to be advice on the tax or other legal effects of the Plan.

In order to have the right to vote for acceptance or rejection of the Plan, Claims and Interests of a Holder must either (i) have been scheduled by Debtor as not being disputed, contingent, or unliquidated or (ii) be represented by a timely filed proof of claim, and such Claim or Interest must not have been disallowed under Section 502 of the Bankruptcy Code or Bankruptcy Rule 3018 as of Confirmation, or disqualified under Section 1126(e) of the Bankruptcy Code as being voted in bad faith. The Bankruptcy Court set a bar date of September 14, 2006 as the deadline for filing proofs of claims in this Case.

[Remainder of Page Intentionally Left Blank]

- 9 -

**HOLDERS OF SUCH CLAIMS AND INTERESTS MAY VOTE WITH RESPECT TO THE PLAN BY COMPLETING AND DELIVERING THE ENCLOSED BALLOT TO:**

**CLERK, UNITED STATES BANKRUPTCY COURT**
**ROOM 1340**
**RICHARD B. RUSSELL FEDERAL BUILDING**
**75 SPRING STREET**
**ATLANTA, GEORGIA 30303-3367**

**BALLOTS MUST BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME ON _____[TBD]_____, 2006 TO BE COUNTED.**

Ballots from Holders of Claims or Interests that are signed and returned, but not expressly voted either for acceptance or rejection of the Plan <u>will be counted as ballots for the acceptance of the Plan</u>.  Except as may be allowed by the Bankruptcy Court, a ballot accepting the Plan may not be revoked.

The Bankruptcy Court has set ____[TBD]____ prevailing Eastern Time on ___[TBD]__, 2006, in Courtroom 1204, United States Courthouse, 75 Spring Street, S.W., Atlanta, Georgia 30303, as the time, date and place for the hearing on Confirmation of the Plan (the "Confirmation Hearing").

The Confirmation Hearing may be adjourned and continued from time to time without notice other than to those in attendance at the hearing or any adjournment thereof.

[Remainder of Page Intentionally Left Blank]

## III.   SUMARY EXPLANATION OF CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.   The formulation of a plan of reorganization or liquidation is the primary goal of a Chapter 11 case. The reorganization plan is the vehicle for satisfying, to the extent possible, the Claims against and Interests in Debtor.   A reorganization plan can provide for the liquidation of a debtor's assets, as is the case for this Debtor.

Holders of Claims and Interests whose Claims or Interests are impaired by the Plan are afforded the opportunity to vote to accept or reject the Plan.   A class of Claims or Interests is impaired if the Claims or Interests constituting that class are not paid in full or if the Claims or Interests are adversely affected by the Plan.   The Court will determine whether the impaired classes have accepted the Plan by determining whether sufficient acceptances have been received from the Holders of Claims in such impaired classes.   An impaired class of Claims will be determined to have accepted the Plan if Holders of Allowed Claims in that class casting votes in favor of the Plan (i) hold at least two-thirds in amount of the Allowed Claims of the Holders in such class who actually vote on the Plan, and (ii) comprise more than one-half the number of Holders of the Allowed Claims in such class who actually vote on the Plan.

**THE VOTE OF A PARTICULAR CLASS BINDS ALL MEMBERS OF THAT CLASS.  THUS, IF A CLASS VOTES TO ACCEPT THE PLAN, THE PROVISIONS OF THE BANKRUPTCY CODE DESIGNED TO PROTECT REJECTING CLASSES CANNOT BE INVOKED EVEN BY MEMBERS OF THAT CLASS WHO VOTED TO REJECT THE PLAN OR WHO ELECTED NOT TO VOTE AT ALL.   CONVERSELY, IF A CLASS REJECTS THE PLAN, THE MEMBERS OF SUCH CLASS WHO VOTED TO ACCEPT THE PLAN, MAY BE DEPRIVED OF THE BENEFITS OF THE PLAN IF THE PLAN IS NOT CONFIRMED.  EACH SUB-CLASS (E.G., CLASSES 3A AND 3B) ARE TREATED AS A SEPARATE CLASS UNDER THIS PLAN FOR VOTING PURPOSES.**

The Bankruptcy Code does not require that every class of Claims or Interests vote in favor of the Plan.   The Plan, however, must be accepted by at least one class of Holders of Claims or Interests that is impaired under the Plan.   The Bankruptcy Court may confirm a Chapter 11 plan notwithstanding the rejection of the Plan by one or more classes of Claims or Interests in what is inelegantly referred to as a "cram-down."   The criteria under which the Bankruptcy Court may "cram-down" and confirm the Plan over the objection of one or more classes of Claims or Interests are set forth in Section 1129(b) of the Bankruptcy Code and, among other requirements, includes the requirement that  (i) the Plan does not discriminate unfairly against such class; (ii) the Plan is fair and equitable as to such class, and (iii) the value or benefits to be distributed to the members of such class will not be less than what the members of that class would have received if Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Even if all classes of Claims and Interests accept the Plan, the Bankruptcy Court may deny Confirmation if either the Plan or Debtor fails to comply with all of the applicable

- 11 -

provisions of the Bankruptcy Code, in particular the provisions of Section 1129 of the Bankruptcy Code governing confirmation of a plan, including, but not limited to, provisions that require that:

(1)    Debtor comply with all applicable provisions of Chapter 11, including the provisions of Sections 1122 and 1123 of the Bankruptcy Code governing the classification of Claims and Interests, and the contents of a plan;

(2)    Debtor has proposed the Plan in good faith and not by any means forbidden by law;

(3)    Debtor has disclosed any payment made or promised by Debtor to any person for services in connection with the Chapter 11 case;

(4)    one or more of the classes of impaired Claims or Interests has voted to accept the Plan;

(5)    the Plan does not discriminate unfairly against and is fair and equitable to any non-accepting class of impaired Claims or Interests;

(6)    the Plan is in the best interest of Holders of Claims and Interests (i.e. each Holder of an Allowed Claim or Interest either has accepted the Plan or will receive on account of that Claim or Interest an amount of property with a value, as of Closing, that is not less than the amount that the Holder of a Claim or Interest would receive if Debtor was liquidated under Chapter 7 of the Bankruptcy Code on the Closing Date); and

(7)    the Plan is feasible.

Debtor believes that the Plan as proposed satisfies all of the statutory requirements imposed by Section 1129 of the Bankruptcy Code. However, any objections to the Plan filed and prosecuted by a party in interest may prevent or delay Confirmation if the Bankruptcy Court allows the objection, or if an appeal of a denial of such objection is pursued.

[Remainder of Page Intentionally Left Blank]

Aerosol Disclosure Statement wr Plan.5.3.DOC

## IV.    INFORMATION ABOUT THE DEBTOR

### A.    Debtor's History and Background

Debtor is a Georgia limited liability corporation that was formed on March 13, 2000 to acquire Debtor's predecessor company, Aerosol Specialties. Founded in Atlanta, Georgia in 1976 with a single production line, Aerosol Specialties grew steadily over the years, operating out of a production facility and separate warehouse facility that were both located in Kennesaw, Georgia. In 2000, the founder chose to retire and sold the assets of Aerosol Specialties to Debtor and the current ownership group, led by Leigh Fragnoli, the President and CEO of Debtor. Under Fragnoli's leadership Debtor has grown the business acquired from $5 million in revenues in fiscal year 2000 to approximately $16.2 million in revenues for fiscal year 2005.

### 1.    Production Facilities and Product Lines

Due to its tremendous growth, Debtor outgrew its Kennesaw facilities and decided to relocate its production and warehouse facilities and office. In late 2004 and early 2005, Debtor moved to its current facility in Canton, Georgia, located at 189 Etowah Industrial Court. The Canton location is a 106,000 square foot leased facility and is the first new aerosol production facility built in the United States in the past ten years. The move allowed the company to consolidate its manufacturing and warehousing in one location, while providing room for growth.

Debtor's new production facility contains seven total production lines, including four aerosol fill lines and three liquid fill lines. The new production facility also includes an aerosol food fill line that is contained within a certified food clean room, the only such independent contract food fill line in the Southeastern United States. These manufacturing and production capabilities allow Debtor to utilize essentially all liquefied and compressed gases used in the aerosol industry.

Utilizing both pressure filling and under-cap filling technologies, Debtor develops and manufactures over 250 products under over 1,200 labels, ranging from industrial products to food items. Debtor manufactures small to large volume specialty private label and contract packaging for the following markets: Automotive; Paints and Coatings; Industrial; Adhesives; Commercial; Food and Food Services; Personal Care products; and Retail.

A sampling of products produced by market segment follows:

- 13 -

- Automotive
  - Appearance product line:
    - Carpet and upholstery cleaners
    - Carpet protectants (water-based and solvent-based)
    - Fabric protectant
    - Leather protectant
    - Odor eliminators
    - Tire shine (foaming, no-touch and regular)
    - Spray wax
    - Waterless wash & wax

  - Performance product line:
    - Brake, carburetor, choke and parts cleaners
    - De-icers
    - Gasoline treatments
    - Undercoating
    - Tire Inflator
    - Degreasers and lubricants

- Industrial
  - Industrial product line
    - All-purpose cleaners
    - Cable cleaners
    - Degreasers
    - Dry Teflon lubricants
    - Grease and lubricants

  - Institutional product line
    - All-purpose cleaners
    - Disinfectants
    - Silicones
    - Screen washes
    - Skin balms
    - Vandal mark removers

- Paints and Coatings
  - Automotive line:
    - Primers
    - Paint removers
    - Interior and exterior paints

  - Commercial line:
    - Safety spray paints
    - Field marking spray paints
    - Traffic marking spray paints
    - Rubber coatings

- Food
    - Premium butter flavor oil
    - Premium garlic flavor oil
    - Canola vegetable oil release
    - High heat oil release
    - Dressings
    - Condiment sprays
    - Bulk oil packaging

- Retail
    - Tick and flea killers
    - Wasp and hornet sprays
    - Odor eliminators
    - Ant killer
    - Lubricants
    - Craft paints
    - Finishing sprays

- Fragrances
    - Air fresheners
    - *Deodorizers*

Chart A presents Debtor's sales by market segment.

- 14 -



**Chart A – Sales by Market Segment**

Debtor mixes ingredients in accordance with either a customer's proprietary formula or Debtor's supplied formulation to create a specific product for its customers. In some instances, Debtor receives the customer's product directly from the customer in its final formulation. Debtor then fills the product with pressure filling and under-cap filling technologies into specially designed, custom aerosol cans and other approved containers. Products are then labeled, boxed and shipped to the customer or a designated retailer. Debtor serves a very diverse group of customers that span all across the United States, Europe, the Middle East and the Pacific Rim.

Debtor uses non-toxic, naturally occurring hydrocarbon and specially chlorinated gasses in its production process that enable the product to be sprayed from an aerosol can. During the production process, Debtor does not emit or discharge any substances into the atmosphere beyond the Title 5 air quality standard levels permitted for the industry and complies with all federal and state manufacturing and safety laws. Like all aerosol manufacturers, Debtor does not use CFC's in its aerosol production. The federal government banned the use of CFC's in aerosol products in 1976.

2. <u>Historical Financial Performance; Events Leading Up to the Filing of Debtor's Chapter 11 Petition</u>

Reflected in Chart B are Debtor's historical financial data taken from Debtor's audited financial statements through 2003 and internal financial statements for 2004 and 2005 and the interim period ending August 2006.

**Chart B - Summary Historical Financial Information
For the Years Ended December 31, 2001 - 2005
And the Eight-Month Period Ending August 31, 2006**

**($ in thousands)**

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 (8 months) |
|---|---|---|---|---|---|---|
| Revenues | $9,717 | $11,231 | $12,629 | $16,323 | $16,169 | $9,860 |
| Cost of Sales | 7,833 | 8,894 | 9,290 | 14,972 | 12,658 | 6,702 |
| Gross Profit | 1,884 | 2,337 | 3,339 | 1,351 | 3,511 | 3,158 |
| Operating Expenses | 1,161 | 1,505 | 3,459 | 2,801 | 4,455 | 2,983 |
| Operating Income (EBIT) | 723 | 832 | (120) | (1,450) | (944) | 175 |
| Other Inc. (Expense), net | (21) | (195) | 11 | (189) | 49 | (145) |
| Interest Expense (net) | (425) | (458) | (451) | (531) | (825) | (202) |
| Bankruptcy Expenses | - | - | - | - | - | (150) |
| Net Income (Loss) | $277 | $179 | ($560) | ($2,170) | ($1,720) | ($322) |
| EBITDA | $985 | $929 | $337 | ($1,273) | ($499) | $185 |
| Depreciation and Amort. | $283 | $292 | $446 | $366 | $396 | $305 |
| Gross Margin Percentage | 19.4% | 20.8% | 26.4% | 8.3% | 21.7% | 32.0% |

Debtor's historical revenue growth has been strong, generating a compounded annual growth rate of 16.5% during the period 2001 through 2005. Debtor has been able to achieve these results despite the financial and operational problems it experienced during 2004 and 2005. During the time frame 2001 through 2003, Debtor saw its margins increase from 19.4% to 26.4%. However, during 2004 and the first half of 2005 Debtor experienced a major downturn in its profitability primarily due to its decision to relocate its production facility from Kennesaw, Georgia to Canton, Georgia. Debtor believes that in the long term the move will be viewed as a tremendous growth opportunity enabling Debtor to obtain operational efficiencies. However, Debtor underestimated the costs associated with its move and the disruptive effect the move would have on its production and operations. Debtor started the move during the summer/fall 2004 culminating with it moving into its new Canton facility in November 2004. Production issues ensued in its new facility through the spring of 2005 when it finally started production in a fully operational mode. As a result of the move, Debtor ended up spending in excess of $1 million more than it originally budgeted for the move and getting the facility ready. This resulted in Debtor utilizing its cash resources for the purchase of capital items which were unrelated to expenditures made to cover normal day-to-day operations.

Further, many of Debtor's products are petrochemical based and during 2004 the cost of oil started to increase at a rapid pace. As a result cost of sales rose dramatically in 2004,

- 16 -

impacted by raw materials price increases of 45%. Unfortunately, Debtor's financial systems and management personnel were unable to adequately identify these cost increases in raw materials and pass those costs onto its customers in a timely manner. Debtor was slow to recognize the negative P&L impact (the CFO has since been terminated) and did not institute its first price increase until October 2004. This resulted in a sharp reduction in its gross margins and caused a further demand on its already strained cash resources. During 2005 and continuing into the first eight months of 2006, Debtor has seen its gross margins increase to its current 32% which represent a five-year high.

Because Debtor found its cash resources limited, Debtor started slowing payments to its vendors. This resulted in many vendors putting Debtor on COD or refusing to deliver at all. In order to continue getting credit, commencing in early 2004 and continuing into 2005 Debtor was forced to make extraordinary payments to its vendors in an effort to pay down past due amounts. While this allowed Debtor to continue obtaining necessary raw materials in limited quantities, it put an increased pressure on its cash resources. As a result of the unavailability of cash and limited ability to purchase raw materials, Debtor started accepting an increasing percentage of business from customers that supplied their own materials. This caused the company's backlog of unfulfilled orders to go from an historical average of $1.2 million to approximately $2.4 million or more. It also increased delivery times from an historical average of approximately 4 weeks from the receipt of a purchase order to an average of an 8 week delivery cycle.

In order to meet its cash needs during this troubled period, management and the current institutional investors collectively invested over $1 million into Debtor in 2005. Additionally, the company's capital structure is supported by an asset-based revolving credit facility from Wachovia Bank. Under normal circumstances this structure would have been sufficient to meet the day-to-day operating needs of the company. However, due to the (i) deterioration in financial performance in 2004, (ii) rapid increases in raw material prices, (iii) the additional impact of the unanticipated disruption associated with the company's move into its Canton facility, and (iv) the related loss of credit terms with its major suppliers, the current capital structure did not provide the liquidity and flexibility needed to fully implement the company's strategic plan. Debtor increased the size of its revolving credit facility and Wachovia started to relax its borrowing base requirements thereby allowing Debtor to borrow more on its credit facility as a percentage of its collateral base. This, however, was only a short-term solution to its cash needs.

As a result of instituting better financial systems, Debtor has been able to raise its prices to its customers by approximately 43% during 2005. Excluding tinplate can prices, raw material prices appear to have stabilized. Debtor believes that during 2005 it was able to correct its operational deficiencies and positioned itself to regain profitable operations. Current internal efforts during 2005 to improve the financial performance of the Company include:

- Retaining the services of an outside consultant that specialized in turnaround situations
- Hired a Chief Operating Officer in December 2005

- 17 -

- Replacing its CFO with a strong controller who has instituted strong accounting procedures and controls
- Completed the start-up of the Canton facility and now has all seven production lines running smoothly.    Planned 2006 capital expenditures will further improve performance and margins within the manufacturing environment.
- Increased productivity of its production labor
- Reduced inventory from over $3 million to $1.4 million
- Generated significant improvements to its costing and pricing practices

Unfortunately, while Debtor took the necessary corrective steps internally to put it on the road to achieve profitability, it was still in need to refinance its debt structure in order to free up cash to purchase raw materials in an effort to satisfy the increasing backlog of unfulfilled orders. In early 2005, Wachovia Bank merged with SouthTrust Bank and inherited the Debtor's credit facility. Wachovia began to be concerned with the Debtor's financial condition and its ability to repay the amounts outstanding without an infusion of new equity into the company.   On March 31, 2005, Debtor entered into a forbearance agreement with Wachovia, which has been subsequently amended an additional five times.  The last forbearance agreement expired on May 19, 2006.

Commencing in October 2005, Debtor started to explore alternative financing arrangements to replace the Wachovia Bank credit facility, which included looking for a new strategic partner to invest in Debtor.  Debtor retained the services of an investment banking firm which began the search for an investment partner.   In addition, the Debtor commenced discussions with LaSalle Bank who had tentatively committed to refinancing the Wachovia credit facilities.  Debtor spent the period from January 2006 through May 2006 trying to satisfy the requirements of LaSalle Bank in order to close on its refinancing.  Unfortunately, in early May 2006, LaSalle officially withdrew its interest in refinancing Debtor, leaving the Debtor with limited choices.

Once the Sixth Amendment to the Forbearance Agreement with Wachovia expired in May 2006, Wachovia called its credit facilities in default and sent a letter to the largest of Debtor's customers requiring them to make payments of amounts owed to Debtor directly to Wachovia.   In addition, Wachovia refused to honor any additional disbursement checks issued by Debtor. This put Debtor in a severe cash situation which had a material and adverse effect on Debtor's ability to maintain its normal production runs and continue uninterrupted operations. From June 1 through June 21, Wachovia collected approximately $800,000 in receivables directly from Debtor's customers, and applied these collections directly against its revolving credit line, thereby depriving Debtor of necessary cash to purchase raw materials and pay for its ongoing operations.   By the beginning of the week commencing June 19, 2006, Debtor was out of cash and was required to virtually discontinue any production at its facility.

Once the LaSalle Bank refinancing fell through, Debtor stepped up its discussions with various parties that expressed an interest in investing in, or purchasing Debtor.  Debtor's Board of Directors received interest from at least nine interested parties and reviewed term sheets from at least four of them.  The term sheets for two of these interested parties were presented by

Debtor to Wachovia as part of the negotiations with these parties.  In both situations, the interested parties proposed a transaction that would have enabled Debtor to avoid a bankruptcy filing (at least initially).   Wachovia, however, turned down the proposed treatment of their claims made by these parties, and stated to these parties that insufficient cash was being offered by them for Debtor to overcome its present financial condition.  A third term sheet received from Harbert was presented to Wachovia.  While Wachovia did not agree to the treatment proposed for its claims, Debtor's Board of Directors believed that the Harbert proposal was the best proposal it received and on June 12, 2006 elected to accept the Letter of Intent from Harbert (the "Harbert LOI").  One of the conditions included in the Harbert LOI was that Debtor would need to file a petition under chapter 11 of the Bankruptcy Code.   On June 21, 2006, Debtor initiated the Case by filing its voluntary Chapter 11 petition.

**B.**     **Claims Against Debtor**

      The following summary of claims is for informational purposes only and is without prejudice to the rights of Debtor to object to claims, including but not limited to claims arising from applications for compensation submitted to the Court pursuant to § 330 of the Bankruptcy Code.   The actual amount owed to creditors will be determined after Debtor has the opportunity to review proofs of claim filed in this Case.  The bar date for claims to be asserted against Debtor was set for September 14, 2006.  (This is not the bar date for administrative claims or claims arising from the rejection of leases and executory contracts.  Such date will be set by the Court at a later date.)  The following summary is an estimate of the claims against Debtor and the alleged security interests asserted by the respective party.  Debtor reserves the right to object to the amount claimed by such party and to challenge the security interest asserted against Debtor's assets and the value of the claims alleged to be secured thereby.

1.     Administrative Claims; Professional Fee Claims, Priority Tax-Claims.

      Debtor estimates that postpetition trade obligations entitled to priority will be minimal because Debtor will continue to pay such trade obligations as they come due in the ordinary course of business according to their terms.  Expenses of administration, including compensation to attorneys and other professionals approved by the Bankruptcy Court are estimated to be $300,000 to $500,000, but will be impacted by how long the Case continues and are subject to allowance by the Bankruptcy Court.  Debtor is not aware of any outstanding priority tax-claims for the prepetition period and is paying postpetition priority tax claims in the ordinary course of business.

2.     Secured Claims of Creditors.

      Alleged secured claims aggregating approximately $6.632 million as of the Petition Date in principal and accrued interest are asserted against Debtor's assets.  Some of these claims may be subject to disallowance or be deemed partially secured and partially unsecured (or totally unsecured) pursuant to § 506 of the Bankruptcy Code.  Debtor has not moved the Bankruptcy Court to disallow any Claims of the Secured Creditors, but reserves the right to object to Claims

- 19 -

within the period prescribed by the Bankruptcy Court.  The secured claims against the Debtor are as follows:

(a)    <u>Wachovia Bank, National Association</u>.    The principal secured claim against Debtor is the revolving line of credit with Wachovia Bank of which approximately $2.051 million is allegedly outstanding as of the petition date.  Debtor also has three notes payable to Wachovia that were scheduled to mature in October 2007 and January 2009.  The principal on the notes to Wachovia Bank total approximately $410,000.   Wachovia Bank claims other interest and fees due to it raising its total claim to approximately $2.827 million.  The debt to Wachovia Bank is secured by an alleged first priority security interest in, and lien on, substantially all of the assets of the Debtor, including its cash, accounts receivables, equipment (subject to a limited carveout of specific equipment in favor of a senior lien to another creditor), general intangibles, and fixed assets.

**Debtor is of the opinion that the value of the collateral securing Wachovia's claim is less than its estimated Allowed Claim and, therefor, that Wachovia Bank is only partially secured.**

(b)    <u>Blue Ridge Investors II, LP</u>.    Debtor also allegedly owes approximately $3.558 million to Blue Ridge, a private equity fund, on various notes, including accrued interest and other charges asserted by Blue Ridge.    The debt owed to Blue Ridge is secured by an alleged second priority security interest in, and lien on, substantially all of the assets of Debtor, including its cash, accounts receivables, equipment (subject to a limited carveout of specific equipment in favor of a senior lien to another creditor), general intangibles, and fixed assets, and is allegedly junior and subordinate, however, to the security interests of Wachovia Bank in such collateral.  Blue Ridge also holds as a collateral assignment, the rights of Debtor in a $2 million key man life insurance policy on the life of Leigh Fragnoli that is owned by Debtor (the "Fragnoli Life Insurance Policy").  Blue Ridge also holds a warrant that would enable Blue Ridge to acquire up to 80% of the equity of Debtor for nominal consideration.

**Debtor is of the opinion that the value of the collateral securing Blue Ridge's claim is less than its estimated Allowed Claim and because it believes that Wachovia Bank is only partially secured, that Blue Ridge's claim is totally unsecured.**

(c)    <u>Badger Capital I, LLC</u>.    Debtor also allegedly owes approximately $247,000 to Badger Capital on a note, including accrued interest and other charges asserted by Badger Capital.    The debt owed to Badger Capital is secured by an alleged first priority security interest in, and lien on, certain specifically identified air compression equipment, a labeler and an oven. The security interests of Wachovia Bank and Blue Ridge are allegedly junior and subordinate to the security interests of Badger Capital in this specifically identified collateral.

**Debtor is of the opinion that the value of the collateral securing Badger Capital's claim is less than its estimated Allowed Claim and, therefor, that Badger Capital is only partially secured.**

- 20 -

(d)    <u>Harbert Private Equity Fund II, LLC</u>.    Pursuant to authority of the Bankruptcy Court, Harbert has agreed to provide postpetition financing to Debtor in an amount up to $1 million (with an option of Harbert to provide up to a total of $2 million), which is secured by a first priority, priming security interest in, and lien on, all of Debtor's assets, senior to the liens of Wachovia Bank, Blue Ridge, and Badger Capital.    As of August 31, 2006, the balance outstanding on the post-petition financing equaled $987,000.

**If the sale to Harbert's affiliate is completed as contemplated in the Plan, the balance outstanding under the postpetition financing will be converted to equity in its affiliate. Debtor is of the opinion that if such sale is not consummated, the value of the collateral securing Harbert's claim will be in excess of its estimated Allowed Claim and, therefore, that Harbert's claim will be fully secured.**

3.    <u>Unsecured Claims</u>.

Total Unsecured Claims against the Debtor are estimated at approximately $4.10 million. The Unsecured Claims against Debtor are proposed to be classified into two classes.  As of the Petition Date, Debtor believes it owes its trade vendors approximately $2.68 million.  Prior to the Petition Date, Debtor identified 27 vendors that it deemed necessary to the continuation of Debtor's business.  Debtor obtained agreements from 20 of these vendors to forbear on amounts owed to the vendors.  The amounts owed to the Forbearing Vendors total approximately $1.68 million of the total owed to vendors and are classified separately in Class 5 from the claims of trade vendors that did not enter Forbearance Agreements and other general unsecured creditors.

As of the Petition Date, Debtor believes it may owe at least approximately $3.94 million to other general unsecured creditors that do not assert a validly perfected security interest against any of the assets of Debtor.  These claims consist of the following:

- The unsecured claim of Geneva Associates Merchant Banking Partners, I, LLC ("Geneva") in the alleged approximate amount of $1.365 million.  Geneva is the investment company that provided the initial funding for the acquisition of Debtor's business by Fragnoli back in 2000, and provided this funding through a loan from Blue Ridge.  The balance outstanding arises from direct loans made by Geneva to Debtor during 2005, accrued interest, and other advances made by Geneva on Debtor's behalf.  Geneva also has currently one of its principals sitting on Debtor's Board of Directors, and until early June 2006 had a second of its representatives also sitting as a member of the Debtor's board, both appointed by authority granted to Blue Ridge under its loan documents.

- Misty Spray, LLC ("Misty Spray"), the landlord who leases the Canton facility to Debtor, holds a prepetition rent claim against Debtor which is alleged by the landlord to be approximately $598,000.  If Debtor elects to assume the Real Property Lease, the final amount determined to be due and owing will need to be paid as the Real Property Cure Amount in order for the Real Property Lease to be assumed.

- 21 -

- David Hughes and Harold Wenal, principals of the landlord, Misty Spray, allegedly hold an unsecured claim for approximately $351,000 for a loan made to Debtor. This loan was made on an alleged secured basis with the principals allegedly holding a security interest in all of Debtor's assets. However, such individuals have not taken any steps to properly perfect their security interests in such collateral; therefor their claim is unsecured.

- Thomas VanSant, the former owner of the predecessor company, Aerosol Specialties, who sold the assets of Aerosol Specialties to Debtor, holds an alleged unsecured claim of approximately $75,000 for consulting services and non-competition fees owed as a result of the original sale in 2000.

- Ashland Distribution Company holds an unsecured claim for approximately $26,000 relating to the sale of various storage tanks to Debtor. This loan was made on an alleged secured basis with Ashland allegedly holding a security interest in the storage tanks. However, Ashland has not taken any steps to properly perfect its security interests in such collateral; therefore its claim is unsecured.

- Other unsecured creditors in the aggregate amount of approximately $1,525,000.

The actual amounts of Claims of Unsecured Creditors shall be determined after proofs of claim have been filed, any objections of Debtor thereto are finally determined and the value of collateral securing partially secured creditors have been determined by the Bankruptcy Court. Debtor has offered alternative treatment under the Plan to Wachovia Bank, Blue Ridge and Badger Capital. If any or all of these parties reject the primary treatment offered, then the alternative treatment may cause the undersecured portion of their claims to be included in the class of claims of general unsecured creditors. If this were to happen, it is Debtor's opinion that unsecured creditors will have the proposed recovery on their claims materially and adversely diluted.

## C.  <u>Assets of Debtor</u>

Debtor's assets consist of a significant amount of personal property. Debtor does not own any real property and operates its facility in premises located in Canton, Georgia that are leased from Misty Spray pursuant to a lease agreement dated June 8, 2004 (the "Real Property Lease").

The building subject to the Real Property Lease was built in 1999, and retrofitted for Debtor's use and occupancy commencing in late 2004. It contains office space, manufacturing facilities, and warehouse and distribution space. Debtor uses approximately 57,200 square feet to manufacture goods, approximately 42,400 square feet for warehouse and distribution activities, and approximately 6,400 square feet for office space. Debtor has not yet indicated whether it intends to assume or reject the Real Property Lease. (See discussion at Article VII, Section E.1 in this Disclosure Statement.) Debtor believes that the Real Property is in compliance with all applicable environmental regulations and that it operates with all necessary

- 22 -

permits and is not at risk of losing any necessary permits due to non-compliance with regulatory requirements. Debtor has no outstanding issues with the Occupational Safety and Health Administration or state regulatory authorities that would adversely affect its operations or any of its assets.

All of Debtor's assets are pledged to one or more of the Secured Creditors holding claims against Debtor. Debtor is of the opinion that Debtor does not have any unencumbered Assets available for Unsecured Creditors upon a forced liquidation of its business and assets by either Wachovia Bank or Blue Ridge.

1.    Personal Property.

(i)  *Machinery, Equipment and Other Fixed Assets.*

Debtor owns numerous pieces of equipment and other tangible and intangible personal property utilized in its production operations, warehouse and office. Due to the nature of the equipment, issues can arise as to whether some of the equipment is deemed to be fixtures in which the landlord would have an interest or equipment subject to the security interests of the secured creditors.

The equipment that Debtor owns is primarily aerosol filling machinery and related support equipment. The machinery and equipment dates from 1964 to 2004 with the majority being of 2000s vintage. Debtor has upgraded and updated much of its equipment in order to maintain modern conditions and compliance with regulatory demands. Prior to the filing of its chapter 11 petition, Debtor tried to maintain a consistent preventative maintenance program, and performs the required tasks and testing, as well as major maintenance functions, internally. Cash constraints, however, have limited the amount of repairs and maintenance that Debtor can afford to undertake. Most of the equipment utilized by Debtor is owned by Debtor. There are few pieces of equipment, such as forklifts, that are leased. As of the Petition Date, Debtor's financial records indicate that its machinery and equipment are being carried at a net book value of $2,002,648 (net of depreciation).

The following list is a summary of the types of machinery and equipment that are owned by Debtor:

- Aerosol Filling Lines
- Air Compressors
- Air Dryers
- Boilers
- Coders
- Dispersers
- Labelers

- Lift Trucks
- Liquid Filling Lines
- Fillers
- Plant Support Equipment
- Stretch Wrapping Machines
- Tanks
- Trailers

Various existing and prospective lending institutions have evaluated the machinery and equipment of Debtor. In April 2005, Wachovia Bank commissioned a machinery and equipment

- 23 -

appraisal to determine an unbiased opinion of the estimated Forced Liquidation Value ("FLV") and estimated Orderly Liquidation Value ("OLV") of Debtor's machinery and equipment (the "Wachovia Appraisal"). In February 2006, LaSalle Business Credit likewise commissioned a machinery and equipment appraisal to also determine the FLV and OLV of the Debtor's machinery and equipment (the "LaSalle Appraisal"). While neither of these reports were commissioned by Debtor and therefore may not be relied upon by Debtor, they do provide useful information as to the estimated values of Debtor's machinery and equipment, at least in the opinions of the respective appraisers as of the effective date of their reports. The following general definitions are applicable to the determination of FLV and OLV by the appraisers:

| | |
|---|---|
| *Forced Liquidation Value* | The estimated gross amount, expressed in terms of money, that could typically be realized from a properly advertised and conducted public auction; the seller being compelled to sell with a sense of immediacy on an "as is, where is" basis, as of the effective date. The conclusions will take into consideration location, difficulty or removal, condition, adaptability, specialization, marketability, overall appearance and psychological appeal. The general time frame necessary to dispose of the equipment under this assumption is 7 weeks or less. |
| *Orderly Liquidation Value* | The estimated gross amount, expressed in terms of money, that could typically be realized from a privately negotiated sale, or a properly advertised and professionally managed liquidation sale, given a reasonable period of time to find (a) purchaser(s); the seller being compelled to sell on an "as is, where is" basis, as of the effective date. The general time frame necessary to dispose of the equipment under this assumption is 9 to 12 weeks or more. |

Chart C reflects the estimated FLV and OLV under each of the appraisals as well as each of these methodologies, net of the costs of sales. Estimated costs include direct expenses (personnel expenses, liquidators expenses, security and advertising), holding costs (shut down costs, real property holding costs, personal property holding costs, utilities, etc.), and commissions (in the case of OLV; in a FLV scenario the Buyer usually pays a buyer's premium to cover commissions).

### Chart C - Estimated Valuations of Debtor's Machinery and Equipment
### In Thousands of Dollars (000's)

|  | Wachovia Appraisal | | LaSalle Appraisal | |
|---|---|---|---|---|
|  | FLV | OLV | FLV | OLV |
| Gross Value | $686 | $847 | $630 | $953 |
| Estimated expenses, holding costs, and commissions | (211) | (381) | (215) | (561) |
| Net Value | $475 | $466 | $415 | $392 |

(ii)    *Inventory.*

Debtor had approximately $1,636,000 in raw material and finished goods inventory reflected on its books as of the Petition Date. As a contract manufacturer, finished goods inventory is generally relatively small at any point in time because most orders are filled through a production run tied to a purchase order. A production run usually lasts from less than a day to a few days or more. As a result, the finished goods are usually shipped within days after the goods are completed so little finished goods inventory is carried by Debtor. Raw materials inventory is primarily made up of cans, boxes and shipping materials, component parts, aerosol and other accelerants stored in Debtor's tank farm, and drums of chemicals in various quantities and types stored in its warehouse. Because Debtor is operating its business, actual inventory amounts are in constant fluctuation.

The following is a summary of Debtor's inventory as of the Petition Date and estimated as of August 31, 2006:

|  | Petition Date | August 31, 2006 |
|---|---|---|
| Finished Goods | $145,000 | $153,757 |
| Raw Materials | 1,469,000 | 1,537,947 |
| Work-in-progress | 22,000 | 26,398 |
|  | $1,636,000 | $1,718,012 |

The actual value of Debtor's inventory is hard to ascertain. Debtor is of the opinion that most of its inventory is usable over time as it continues its normal production. However, in a liquidation scenario, Debtor is of the opinion that most if not all of its inventory is worthless because a good portion of its inventory is classified as hazardous materials. As such there will be a cost of remediation and preparation that will be incurred if these hazardous materials were to be sold and removed from the premises. Debtor believes that the value that could be obtained from the sale of its inventory in a forced or orderly liquidation would be severely impacted by

- 25 -

such remediation costs, and for purposes of estimating its net liquidation value has attributed $150,000 in value to its inventory.

    (iii)   *Accounts Receivable.*

Debtor also carries on its books accounts receivable generated from sales to its customers. As of the Petition Date, Debtor's books and records indicated that it had approximately $1,930,000 in accounts receivable and a note receivable from customers in the amount of $133,000. Because Debtor is operating its business, actual accounts receivable are in constant fluctuation.

The following is a schedule of the aging of Debtor's accounts receivable as of the Petition Date and August 31, 2006:

|  | Petition Date | August 31, 2006 |
|---|---|---|
| Current - < 30 days | $559,000 | $1,834,082 |
| >30 days but <60 days | 513,000 | 659,789 |
| >60 days but < 90 days | 255,000 | 69,638 |
| >90 days | 603,000 | 624,439 |
| Total | $1,930,000 | $3,187,948 |

Debtor is unable to estimate at this time the actual liquidation value of its accounts receivable if it were to discontinue operations. Many of the customers that owe Debtor amounts also have purchase orders that have not yet been fulfilled. As a result, if Debtor were to discontinue operations these account debtors may be hesitant to timely pay the amounts owed. It is not unreasonable to discount the over 90 day receivables by 80% of the net book value reflected and the under 90 day receivables by 30% of such net book value. Applying these percentages, the liquidation value of Debtor's receivable as of the Petition Date and August 31, 2006, can be estimated to $1,049,000 and $1,919,000, respectively.

    (iv)   *Patents and Trademarks.*

Debtor has a number of formulations for products that it has developed that it claims are owned by and proprietary to Debtor. One of these formulations, "Aerosol Fabric Treatment", is subject to a pending U.S. Patent Application No. 11/062,899, filed February 2005. Debtor makes its formulations available to its customers to sell under their own labels while retaining ownership rights in such formulations.

Debtor claims ownership in its name and design trademark which is filed with the United States Patent and Trademark Office under U.S. Trademark Reg. No. 3023049. In addition, Debtor claims state common law rights in a number of trademarks, as well copyrights on a number of its marketing and other materials, which it uses in its business operations. All rights of Debtor in any patents, trademarks, and copyrights, whether registered or not, arising under state law or otherwise, are intended to be included in the Assets to be sold to Buyer.

- 26 -

Further, Debtor is licensee under an exclusive Distribution Agreement and Trade Mark License ("License Agreement") which enables Debtor to be the exclusive distributor of certain products sold under the trade name "K2r" within the United States and Canada. Debtor plans to assume the License Agreement which runs through 2013, and has two additional five year renewal periods, and assign it to Buyer.

2.      Litigation and Claims.

Debtor is not presently involved in any litigation that would be deemed an asset of its estate, however, it intends to file adversary proceedings in the bankruptcy case in an effort to collect past due balances from account debtors that owe the Debtor money reflected in its accounts receivable.


D.      **Ownership of Debtor**

Debtor is a Georgia limited liability company and is currently owned by Leigh Fragnoli (3,999 common units or 99.975%) and his wife Sarah A. Fragnoli (1 common unit or 0.025%), whom collectively own 100% of the common units of Debtor outstanding as of the Petition Date. Pursuant to Debtor's Operating Agreement dated June 30, 2000, Blue Ridge was initially granted 4,000 preferred units as part of the initial funding of Debtor in 2000 when it acquired the business and assets of Aerosol Specialties. On or about January 31, 2003, Debtor redeemed the preferred units for the payment of $400,000 leaving only the common units of Debtor outstanding as of such date.

Additionally, pursuant to the Blue Ridge Loan Documents entered into with Blue Ridge, a warrant was issued for Debtor to Blue Ridge that initially granted Blue Ridge the right to acquire 60% of the common units of Debtor (initially 6,000 common units) for an exercise price of $0.01 per unit. Under certain circumstances which may currently be in effect, the warrant could be adjusted to entitle Blue Ridge the right to acquire 16,000 common units which would represent 80% of the outstanding common units of Debtor.

E.      **Management of Debtor**

Debtor's management is overseen by a Board of Directors that has currently been set at five members pursuant to applicable provisions of Debtor's Operating Agreement. Under the Blue Ridge Loan Documents between Blue Ridge and Debtor, Blue Ridge is entitled to nominate two (2) representatives to the Board of Directors, Fragnoli is entitled to nominate two (2) members to the Board of Directors, and both Blue Ridge and Fragnoli are entitled to mutually nominate the fifth member. Since July 2000 through early June 2006, Blue Ridge has appointed two (2) members to the Board of Directors, both of which are Managing Directors of Blue Ridge, one of which is also a representative of Geneva Associates Merchant Banking Partners I, LLC, and agreed with Fragnoli on the appointment of the third member. Since June 2006, Fragnoli has appointed two members to the Board of Directors, one of which was himself. On May 29, 2006,

Tom Minick, one of the board appointees of Blue Ridge resigned from the Board.   This position has remained vacant since that time.

The following are the current members of the Board of Directors and key management personnel of Debtor.

- *Leigh Fragnoli, President, Director and CEO* – Mr. Fragnoli serves on Debtor's Board of Directors, is Debtor's President and CEO and has held those positions since July 2000.  Mr. Fragnoli has over 30 years of experience in manufacturing. Prior to purchasing Debtor, Mr. Fragnoli was with Bondo Corporation as the Vice President of Operations for 12 years. He had multi-plant responsibilities that included all aerosol operations. Mr. Fragnoli had responsibility for running the company's day-to-day operations. He is a graduate of the Chicago Conservatory of Music with a degree in Music Education. In addition, Mr. Fragnoli is a veteran of the U.S. Navy.  Mr. Fragnoli purchased Debtor from the original owner in June 2000.

- *John MacLeod, CPA, Director and COO* – Mr. MacLeod joined the Company as Chief Operating Officer in December 2005 and has served on its Board of Directors since 2000 as one of Fragnoli's board appointees.   Mr. MacLeod has over 16 years experience as a CFO/COO within the aerosol and automotive industry. His last position was with Cold Jet, LLC in Loveland Ohio. Cold Jet was a specialty machinery company selling their equipment internationally. Prior to joining Cold Jet, Mr. MacLeod was the CFO for Bondo Corporation. Bondo has sales of approximately $100 million and produces specialty coatings for the automotive aftermarket. Mr. MacLeod was responsible for the day-to-day running of the business unit in Cincinnati. He is a graduate of the University of Cincinnati and has a BA in Economics and a MS in Business Administration. In addition John is a certified pubic accountant. At Debtor, Mr. MacLeod has the responsibility for the day to day running of the company's business. He has all staff members as direct reports with the exception of Sales, which remains under Mr. Fragnoli.    Mr. MacLeod has full P&L and balance sheet responsibilities and reports directly to the CEO.

- *Russell R. Myers, Member of the Board of Directors* – Mr. Myers has served on the Board of Directors of Debtor since July 2000 as one of Blue Ridge's board appointees.  Mr. Myers is also a General Partner of Blue Ridge, a Managing Partner of Geneva Merchant Banking Partners Group I, LLC, which is the manager of Geneva Associates Merchant Banking Partners, and a Vice President and director of Geneva Corporation.

- *Terry Merrill, Member of the Board of Directors* – Mr. Merrill has served on the Board of Directors since 2000, and is the appointee that was mutually selected by Fragnoli and Blue Ridge.  Mr. Merrill is President of LOBO, M.B.F., Inc. a Cincinnati Ohio based consulting company that specializes in helping companies enter new markets.  He is also President of Advance Wire and Cable, an Ohio based supplier of wire and cable to the military, and former President of Bondo/Mar-Hyde Corporation, a supplier of resin based products and paint supplies.

- ***Rebecca Simonski, CPA, CFE, Controller*** – Ms. Simonski joined Debtor as its controller in 2005. Ms. Simonski has over 10 ten years experience in various public and private accounting related positions, bringing strong financial controls and costing expertise to Debtor. Prior to joining Debtor, she was with Strata Products USA as their Controller. Rebecca has a BS in Accounting from Champlain College and both CPA and CFE certifications.

## F.      Industry and Competition

1.    Overview

The annual domestic aerosol can filling market in the United States is a $2 billion industry with nearly 3.5 billion cans filled in 2004. There are approximately 206 companies that compete in this market, plus some product manufacturers with in-house filling capabilities. The industry has grown an average of 2.5 percent from 2002 through 2004 and is projected to continue on a similar growth path. The sector is relatively mature. Chart D provides a breakdown of the US market by segment.

### Chart D – Industry Contribution by Market Segment
### United States and Puerto Rico – 2004
### (in millions of units)



Source: Consumer Specialty Products Association

The aerosol contract packaging industry is highly fragmented, with the top company representing less than 5% of the total US market.

Fundamental issues affecting the industry include:

- **Outsourcing:**   Outsourcing is a trend that permeates every industry and contract filling industry is no exception.  The aerosol filling industry continues to see an increasing trend toward outsourcing.  Management believes this is reflected in the growth in contract filling and expects new market opportunities to arise as companies seek to bring new products to market with shorter and shorter lead times.

- **Technological innovation:**   Debtor's customers recognize its ability to develop new products, in addition to its ability to deliver products in smaller production runs with shorter lead times.

- **Increased regulation:**   There continues to be an increase in local, state and federal regulation related to aerosol products as well as FDA regulations.  In August 2005, the EPA announced its intention to develop a national aerosol coating regulation.  Debtor feels its new facility and complete compliance with all such regulations puts it ahead of many of its competitors in this area.

2.     Competition

Debtor competes on a regional, national and global basis and is considered a middle tier contract filler and packager within the aerosol industry.  Debtor is the number two player in the Southeast.  The industry is presently going through a round of consolidation, with new "super" aerosol companies such as Outsourcing Services Group emerging as leaders in the industry.  Chart E summarizes the location, ownership and estimated sales of Debtor's key competitors

**Chart E – Primary Competitors**
**($ in Thousands)**

| Competitor | Location | Ownership | Estimated Sales |
|------------|----------|-----------|-----------------|
| Amrep | Marietta, GA | Private | $60,000 |
| Apollo | Smyrna, GA | Private | $20,000 |
| OSG | Gainesville, GA | Private | $110,000 |
| Hydrosol | Bridgeview, IL | Private | $18,000 |
| Fulmer | Rossville, IL | Private | $10,000 |

*Amrep* - AmRep has two manufacturing facilities in the US.   The main facility is in Marietta, Georgia. The second facility is in Dallas, Texas.  AmRep has their own product line called "Misty" and sells 60% of their products into the automotive industry.   The second facility located in Dallas, Texas is a liquid filling facility.  This facility again fills mostly automotive products, like gas treatments, octane boosters, oil treatments, etc. AmRep has had financial difficulties since the late 1980's and currently is being run by its banks.

- 30 -

*Apollo Labs* - Apollo has 2 facilities in the Atlanta area.  The main facility is in Smyrna and a second facility is in Dalton, Georgia.  The Dalton facility produces the majority of their automotive products. Apollo is the largest competitor to Debtor. Both companies have very similar product offerings, and in some cases share business with some customers. Apollo has a very poor relationship with its suppliers and has been turned away by some of these suppliers.  Apollo has had many OSHA issues over the last few years.

*OSG-* Outsourcing Services Group specializes in personal care products and competes with Debtor on a limited basis.

*Hydrosol* - Hydrosol has 1 facility in Bridgeview, Illinois. This facility makes a general line of aerosol and liquid products.   Their major product category is automotive. Over the last few years Aerosol has taken all of Hydrosol's undercoating business.   In some cases Debtor makes products directly for Hydrosol, as it does for all of the companies above, except OSG.   Hydrosol recently underwent a management reorganization to help turn the company around.

*Fulmer* - Fulmer is much smaller and focuses on food service and not deemed a direct competitor to Debtor.

> Debtor's key strengths in the marketplace include:
> - Being recognized as a product innovator and developer of new solutions for the aerosol and liquid industry.
> - Providing small and large volume production services
> - Industry leading lead-times of 2-3 weeks


Currently Debtor's biggest weakness have been (i) its lack of trade credit, and (ii) until it obtained its postpetition financing, availability of cash resources, and the inherent limitations this placed on growth and efficient operations.


[Remainder of Page Intentionally Left Blank]

## V.    SIGNIFICANT EVENTS SINCE FILING OF THE PETITION

### A.    Use of Cash Collateral; Post Petition Financing

On June 22, 2006, Debtor filed an Emergency Motion for an Order Authorizing Use of Cash Collateral.  An emergency preliminary hearing was held on June 27-28, 2006 before the Bankruptcy Court and an order was entered granting Debtor's request and authorizing Debtor to use cash collateral and granting certain secured creditors a replacement lien on all post-petition collateral of Debtor subordinate to the lien of any party providing postpetition financing to Debtor.  On August 3, 2006, a final hearing on Debtor's motion was held and the Bankruptcy Court reaffirmed Debtor's right to use cash collateral.

On June 22, 2006, Debtor filed an Emergency Motion for an Order Authorizing Debtor to Enter into Postpetition Financing from Harbert Private Equity Fund II, LLC (see VI below for a description of Harbert).    An emergency preliminary hearing was held on June 27-28, 2006, before the Bankruptcy Court, and an order was entered granting Debtor's request and authorizing Debtor to borrow a maximum of $500,000 pending the outcome of the final hearing on the motion and granting Harbert a priming first-priority secured lien in all of the prepetition and postpetition collateral of Debtor.  On August 3, 2006, a final hearing on Debtor's motion was held and the Bankruptcy Court reaffirmed Debtor's postpetition financing and authorized Debtor to borrow up to a maximum of $2,000,000 from Harbert, provided that such borrowing is to be limited to $1,000,000 until (1) Debtor enters into a binding purchase agreement with Harbert that commits Harbert to a transaction generally described in the Plan filed by Debtor, and (2) Harbert consents to the increase from $1 million to $2 million.  In addition, the Court ruled, among other things, that the proposed financing is in the best interests of Debtor's general creditor body, that existing secured creditors were adequately protected by their replacement liens, and that the relief requested was appropriate and necessary to avoid immediate and irreparable harm and injury to Debtor and its estate.

### B.    Payment of Prepetition Claims

On June 21, 2006, Debtor filed an Emergency Motion for Order Authorizing Debtor to Pay Pre-Petition Wages and Other Amounts to and on Behalf of Current Employees.   An emergency hearing was held on June 27-28, 2006, before the Bankruptcy Court, and an order was entered granting Debtor's request and authorizing Debtor to pay its current employees all earned pre-petition wages and reimburse them any expenses advanced by them in the pre-petition period for the benefit of Debtor.    The amount paid pursuant to this order totaled approximately $33,600 for prepetition payroll including FICA and withholding taxes, and the monthly payments of $25,000 for health insurance and $6,800 for worker's compensation, some of which will relate to the prepetition period (if prorated for the month).  Debtor is of the belief that all of these claimants' claims would have been entitled to priority and classified in Class 1 had their claims not been earlier paid pursuant to the order of the Bankruptcy Court.

### C.     **Appointment of Community Bankruptcy Liaison**

On June 22, 2006, Debtor filed an Emergency Motion for Authority to Enter into a Management Services Agreement with Harbert Private Equity Fund II, LLC (see VI below for background about Harbert) pursuant to which Harbert was appointed "Community Bankruptcy Liaison" to provide Debtor services relating to operational, sales and financial matters in order to assist Debtor in managing operating costs and maintaining customer relations while in its bankruptcy proceeding. Harbert has appointed Donald Beard as the individual primarily responsible for providing the services to be provided under the Management Agreement. Mr. Beard is Vice President and Director of Investments of the private equity group of Harbert Management Corporation (see VI below). Mr. Beard has approximately 10 years of turnaround and reorganization experience having held interim senior management positions in several turnaround situations. Mr. Beard serves on a number of the boards of directors of the portfolio companies managed by Harbert. Harbert shall not receive any fee for acting in this position other than reimbursement of preapproved expenses up to an aggregate of $1,000 absent further order of the Bankruptcy Court. The purpose of creating this position was to assist Debtor in maintaining the value of its business and assets during the pendency of its chapter 11 proceeding.

### D.     **Appointment of Creditors Committee and its Professionals**

On June 30, 2006, pursuant to authority granted under § 1102(a) of he Bankruptcy Code, the United States Trustee appointed four members to the Official Committee of Creditors Holding Unsecured Claims against Debtor (the "Committee"). The United States Trustee amended its appointment on July 3, 2006 to add an additional creditor to the Committee. Currently the Committee consists of five creditors holding Unsecured Claims against Debtor. On August 9, 2006, the Committee filed its application to approve the employment of Smith, Gambrell & Russell, LLP as counsel to the Committee, which was approved by the Bankruptcy Court on August 14, 2006. On September 14, 2006, the Committee filed an application to employ Hays Financial Consulting, LLC ("Hays Financial") as its financial advisors for purposes of assisting the Committee in, among other things, assessing Debtor's financial needs, evaluating its performance during the pendency of the Case, evaluating the Plan and the values proposed to be paid thereunder. An order of the Bankruptcy Court approving the employment of Hays Financial has not yet been entered by the Court.

## VI.     **HARBERT PRIVATE EQUITY FUND II, LLC**

Under the Plan, Harbert, a Delaware limited liability company and the Court-approved post-petition lender to Aerosol, has agreed to serve as the plan sponsor and through a designee, the Buyer of Debtor's Assets and business as provided for in the Plan. Created in 2003 and based in Birmingham, Alabama, Harbert is a large private equity fund that invests in businesses that management believes will provide significant long-term capital appreciation, have strong competitive dynamics and a stable customer base. Harbert closed its capital raise in December 2004 with a total committed capitalization of $180.8 million. To date Harbert has invested a

total $39.5 million in four portfolio companies whose aggregate transaction value exceeded $177 million.

Harbert is an affiliate of Harbert Management Corporation ("HMC"), an alternative investment management firm serving foundations and endowments, funds of funds, pension funds, financial institutions, insurance companies, family offices and high net worth individuals across multiple asset classes, including domestic and European real estate, venture capital, mezzanine debt, independent power, private equity and public securities. Harbert is managed by HMC's private equity group which was founded in 1998. HMC's private equity group successfully managed its first fund, Harbinger Private Equity Fund I, LLC, a fund that was capitalized with $66 million that closed in 1999. This first fund had invested a total of $51 million in six portfolio companies and has successfully exited each of those investments with a substantial return for its investment partners. HMC's private equity group is made up of individuals with experiences not only in finance, but also in operations and strategic management, with a focus on building and growing businesses. HMC's total committed capital and assets under management have grown from $1.5 billion in 2002 to approximately $5.0 billion in the first quarter of 2006. HMC and its affiliates committed $52.5 million of the total capital raised by Harbert. In addition to its Birmingham, Alabama headquarters, HMC has office locations in New York, New York; Richmond, Virginia; Nashville, Tennessee; and London, UK.

## VII.    THE PLAN

### A.    Concept of the Plan

The Plan contemplates the sale of substantially all of Debtor's assets and business at its present location in Canton, Georgia to Harbert, or its designee. Certain critical vendors have entered into Forbearance Agreements with the Debtor during the prepetition period under which such Forbearing Vendors agreed, in general, to defer a portion of their prepetition claims over a period of as much as 13 months while continuing to provide new payment terms for new goods and services provided to Debtor during the forbearance period. Without the continuation of an uninterrupted flow of these goods and services Debtor's business operations will be materially and adversely affected thereby reducing the likelihood that a sale of Debtor's assets would be consummated. At the Closing of the contemplated sale, Harbert/Buyer shall commit a total of approximately $5.41 million for the purchase of Debtor's Assets and business by, (1) delivering to Debtor cash in the amount equal to $3,300,000 for deposit in to a Plan Fund (see subparagraph F below for a description of the Plan Fund) maintained by Debtor for payment of Allowed Claims, (2) assuming the balance of the Allowed Claims of the vendors whose forbearance agreements are assumed and assigned to Buyer (estimated at approximately $1,133,000), (3) delivering to Debtor cash in the amount equal to the amount necessary to cure any default under the Debtor's Real Property Lease (estimated at a maximum of approximately $598,000), to be deposited by Debtor into an escrow account maintained with Debtor's counsel for payment to the Landlord in the event Debtor elects to assume and assign the Real Property Lease to Buyer, subject to any offset of counterclaims that Debtor may have against Landlord, (4) deliver to Debtor cash in the amount necessary to cure any other Executory Contracts or Unexpired Leases

- 34 -

(other than the Forbearance Agreements or the Real Property Lease) that Debtor will assume and assign to Buyer (pursuant to the Asset Purchase Agreement) for deposit into the Plan Fund, and (5) delivering to certain creditors non-interest bearing contingent promissory notes in the aggregate amount of $400,000.   In addition, pursuant to an order of the Bankruptcy Court, Debtor was authorized to enter into, and Harbert has agreed to provide, post-petition financing to Debtor of an amount up to $1,000,000 during the pendency of Debtor's bankruptcy case (which may be expanded to as much as $2,000,000 at the election of Harbert).  Any amount outstanding under the post-petition financing at the time of the Closing of the sale of Debtor's Assets and business to Buyer shall be converted by Harbert into equity in Buyer.   Consequently, it is estimated that Harbert's total potential commitment under the Plan is approximately $5.41 million to $7.41 million, the actual amount depending on claims of Creditors and the amount of the post-petition financing outstanding at Closing.

## B.    Treatment of Unclassified Claims

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims, including Professional Fee Claims, and Priority Tax Claims have not been classified under the Plan.  All Unclassified Claims are treated under the Plan as follows:

1.    Administrative Claims.

On the Distribution Date, each Holder of an Administrative Claim (i.e., any Claim for an amount entitled to priority under § 507(a)(2) of the Bankruptcy Code because it is a Claim arising under § 503(b)) shall receive from the Plan Fund cash in an amount equal to the unpaid portion of such Allowed Claim, unless (1) the Allowed Administrative Claims, including any Cure Claims, is subject to a Final Order of the Bankruptcy Court authorizing different treatment, (2) Debtor and such Holder shall have agreed in writing to other, less favorable treatment of such Allowed Administrative Claim, or (3) such Administrative Claim has not yet been approved by the Bankruptcy Court or Court as an Allowed Administrative Claim.

2.    Professional Fee Claims.

On the Distribution Date, each Holder of a Professional Fee Claim (i.e., any Claim of professionals entitled to payment under §§ 330 or 331 of the Bankruptcy Code) shall be receive from the Plan Fund, except to the extent such Professional Fee Claim has been previously satisfied by any other source, in full and final satisfaction of such Holder's Allowed Professional Fee Claim, cash in an amount equal to the unpaid portion of such Allowed Professional Fee Claim, unless (1) the Allowed Professional Fee Claim is subject to a Final Order of the Bankruptcy Court authorizing different treatment, (2) Debtor and such Holder shall have agreed in writing to other, less favorable treatment of such Allowed Professional Fee Claim, or (3) such Professional Fee Claim has not yet been approved by the Bankruptcy Court or Court as an Allowed Professional Fee Claim.

- 35 -

3.      Priority Tax Claims.

On the Distribution Date, each Holder of a Priority Tax Claim (i.e., a Claim for an amount entitled to priority under § 507(a)(8) of the Bankruptcy Code) shall receive from the Plan Fund cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, unless (1) the Allowed Priority Tax Claim is subject to a Final Order of the Bankruptcy Court authorizing different treatment, (2) Debtor and such Holder shall have agreed in writing to other, less favorable treatment of such Allowed Priority Tax Claim, or (3) such Priority Tax Claim has not yet been approved by the Bankruptcy Court or Court as an Allowed Priority Tax Claim. Notwithstanding the foregoing, the Holder of a Priority Tax Claim shall not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Priority Tax Claim.   Any Claim or demand for any such penalty will be subject to treatment in Class 6 of the Plan, but only to the extent such Claim is an Allowed Claim.

4.      Reserved for Unclassified Claims.

Adequate reserves in the Plan fund shall be established by Debtor with regard to any Unclassified Claims that may exist as of the Distribution Date but not be either (1) approved by Debtor or (2) if necessary, subject to a final order of the Bankruptcy Court approving such Claim.

**C.      Classification and Treatment of Claims and Interests**

For the purposes of the Plan, Holders of Claims against, or Interests in, the Debtor are classified in accordance with § 1122(a) of the Bankruptcy Code.  Pursuant to Article 4 of the Plan, the payments, distributions and other treatment afforded to Holders of Allowed Claims and Interests under the Plan shall be in full and complete satisfaction, discharge and release of such Allowed Claims or Interests. All classified Claims and Interests shall be afforded the following treatment under the Plan.

1.      Class 1 – Priority Non-Tax Claims.

Class 1 consists of all Allowed Priority Non-Tax Claims.  These Claims consist of the claims permitted priority under §§ 507 (a) or (b), to the extent they are not otherwise an Unclassified Claim, including unsecured priority claims of employees for wages, salaries or commissions, and unpaid contributions to employee benefit plans.  At this time Debtor estimates that there are no Claims in this Class entitled to payment from the Plan Fund.

To the extent any Claims in this Class 1 exists, each Holder of an Allowed Claim in Class 1 on the Distribution Date shall receive from the Plan Fund (1) cash in an amount equal to the amount of such Holder's Allowed Claim or (2) such other, less favorable treatment as is agreed upon in writing by Debtor and the respective Holder of such Allowed Claim.   The Distribution Date shall be a date selected by Debtor which shall be no earlier than three (3) Business Days after the sale contemplated by the Plan closes and no later than the first Business Day that is at least thirty (30) days after such date; provided, however, the distribution shall be made on the

- 36 -

later of (x) the Distribution Date, and (y) the date when such Allowed Claim becomes due and payable according to its terms and conditions.

**Class 1 is an unimpaired Class and is conclusively deemed to have voted to accept the Plan pursuant to § 1126(f) of the Bankruptcy Code.**

2.    Class 2 - Allowed Claims of Wachovia.

Class 2 consists of (1) the Allowed Secured Claims held by Wachovia that are secured by Liens granted under the Wachovia Loan Documents, and (2) any other Allowed Unsecured Claim, if any, of Wachovia.

On the Distribution Date, Wachovia shall receive $1,800,000 in cash from the Plan Fund in full and final satisfaction of any Wachovia Claim that is deemed an Allowed Claim in Class 2, and any remaining Allowed Claim of Wachovia that is not satisfied by the payment of this amount shall be waived and not be provided for, or included, in any other Class.   In addition, as a condition to receiving the treatment provided for hereunder, Wachovia shall (a) release any and all security interests it may possess against any of the Assets under the Wachovia Loan Documents, (b) release the Wachovia Guaranties, and (c) waive any claims it may have against any Person with respect to the Wachovia Claim, including any claims under the Wachovia Guaranties.

If Wachovia does not accept the treatment provided for it in this Section C.2 hereinabove, then its Claims shall receive the alternative treatment set forth in Section D.2 of Article VII of this Disclosure Statement.

**Class 2 is an impaired Class and is entitled to vote on the Plan.**

3.    Class 3A - Allowed Claims of Blue Ridge.

Class 3A consists of (1) the Allowed Secured Claims held by Blue Ridge that are secured by Liens granted under the Blue Ridge Loan Documents, and (2) any other Allowed Unsecured Claim, if any, of Blue Ridge.

On the Distribution Date, Buyer shall deliver a non-interest bearing contingent three year promissory note payable to Blue Ridge for the principal amount equal to the product of (a) $400,000 multiplied by (b) the fraction equal to (i) the amount of the Allowed Claim in Class 3A divided by (ii) the sum of the Allowed Claims in Class 3A and Class 3B; which note shall be payable at 25% of the Free Cash Flow of Debtor's business acquired by Buyer (pro-rata with the Allowed Claim of Class 3B if (1) such Free Cash Flow is insufficient to pay the Class 3A and Class 3B claims in full and (2) the Holder of Class 3B accepts the treatment proposed in Section C.4), for each calendar year, in full and final satisfaction of any Allowed Claim in Class 3A of which it is the Holder.  A copy of the contingent promissory note under which the Allowed Claim in Class 3A shall be paid is attached as Exhibit A to the Plan.   In addition, as a condition to receiving the treatment provided for hereunder, Blue Ridge shall (A) release any and all

- 37 -

security interests it may possess against under the Blue Ridge Loan Documents any of the Assets, (B) release the Blue Ridge Guaranties, (C) assign back to Debtor any interest Blue Ridge may have in the Fragnoli Insurance Policy, and (D) waive any claims it may have against any Person with respect to the Blue Ridge Claim, including any claims it may have under the Blue Ridge Guaranties.

If Blue Ridge does not accept the treatment provided for it in this Section C.3 hereinabove, then its Claims shall receive the alternative treatment set forth in Section D.3 of Article VII of this Disclosure Statement.

**Class 3A is an impaired Class and is entitled to vote on the Plan.**

4.   Class 3B - Allowed Claims of Geneva.

Class 3B consists of all Allowed Claims held by Geneva that are created under (1) the Geneva Loan Documents, (2) and/or any other related documents or agreements executed by Debtor in favor of Geneva, including any Allowed Unsecured Claim of Geneva.

On the Distribution Date, Buyer shall deliver a non-interest bearing contingent three year promissory note payable to Geneva for the principal amount equal to the product of (a) $400,000 multiplied by (b) the fraction equal to (i) the amount of the Allowed Claim in Class 3B divided by (ii) the sum of the Allowed Claims in Class 3A and Class 3B; which note shall be payable at 25% of the Free Cash Flow of Debtor's business acquired by Buyer (pro-rata with the Allowed Claim of Class 3A if (1) such Free Cash Flow is insufficient to pay the Class 3A and Class 3B claims in full and (2) the Holder of Class 3A accepts the treatment proposed in Sect ion C.3), each calendar year, in full and final satisfaction of any Allowed Claim in Class 3B of which it is the Holder.  A copy of the contingent promissory note under which the Allowed Claim in Class 3B shall be paid is attached as Exhibit A to the Plan.  In addition, as a condition to receiving the treatment provided for hereunder, Geneva shall (A) release any and all security interests it may possess under any of the Geneva Loan Documents against any of the Assets, if any, (B) release any Guaranties of the Geneva Claim that may be in existence, and (C) waive any claims it may have against any Person with respect to the Geneva Claim.

If Geneva does not accept the treatment provided for it in this Section C.4 hereinabove, then its Claims shall receive the alternative treatment set forth in Section D.4 of Article VII of this Disclosure Statement.

**Class 3B is an impaired Class and is entitled to vote on the Plan.**

- 38 -

5.   Class 4 - Allowed Claims of Badger Capital.

Class 4 consists of (1) the Allowed Secured Claims held by Badger Capital that are secured by Liens granted under the Badger Capital Loan Documents, and (2) any other Allowed Unsecured Claim, if any, of Badger Capital.

On the Distribution Date, Badger Capital shall receive a Distribution of $150,000 in cash payable from the Plan Fund in full and final satisfaction of any Allowed Claim in Class 4 of which it is the Holder.  In addition, as a condition to receiving the treatment provided for hereunder, Badger Capital shall (i) release any and all security interests it may possess under any of the Badger Loan Documents against any of the Assets, (ii) release any Guaranties of the Badger Capital Claim, and (iii) waive any claims it may have against any Person with respect to the Badger Capital Claim.

If Badger Capital does not accept the treatment provided for it in this Section C.5 hereinabove, then its Claims shall receive the alternative treatment set forth in Section D.5 of Article VII of this Disclosure Statement.

**Class 4 is an impaired class and is entitled to vote on the Plan.**

6.   Class 5 - Allowed Forbearing Vendor Claims.

Class 5 consists of the Allowed Claims held by the Forbearing Vendors; provided, however, Class 5 shall not include any claims of a Forbearing Vendor to the extent Debtor does not assume a respective Forbearance Agreement of such Forbearing Vendor, in which case such Claim to the extent an Allowed Claim will be deemed a Rejection Claim and included in Class 6.

Holders of any Forbearance Agreements that are assumed by Debtor included in Class 5 shall receive (a) sixty days after the Effective Date, (i) cash in the amount equal to such Holder's share of approximately $565,000 (the actual amount  shall be determined by reference to each Holder's respective Forbearance Agreement), and, (ii) have their Forbearance Agreements assigned to, and assumed by, Buyer who shall become obligated to pay the balance of the Allowed Claims of the Forbearing Vendors included in this Class 5 over the periods noted therein, respectively, in cash  pursuant to the terms of the assumed respective Forbearance Agreements (assuming, and to the extent, the respective Forbearing Vendor is in compliance with the terms of their respective Forbearance Agreement during such period), or (b) such other, less favorable treatment agreed upon by Debtor and the Holder of each such Allowed Claim.

**Class 5 is an impaired class and is entitled to vote on the Plan.**

7.  <u>Class 6 - General Unsecured Claims</u>.

Class 6 consists of all Allowed Unsecured Claims not entitled to priority under the Bankruptcy Code of every kind and description, and not otherwise included in any other Class, including without limitation (1) all general Unsecured Claims arising out of goods sold or services rendered to Debtor prior to the Petition Date, (2) any and all Rejection Claims, (3) any Allowed Unsecured Claim of Wachovia if Wachovia does not elect to accept the treatment proposed for it in Section C.2 and therefore the alternative treatment provided for in Section D.2 is applicable, (4) any Allowed Unsecured Claim of Blue Ridge if Blue Ridge does not elect to accept the treatment proposed for it in Section B.3 and therefore the alternative treatment provided for in Section D.3 is applicable, (5) any Allowed Unsecured Claim of Geneva if Geneva does not elect to accept the treatment proposed for it in Section B.4 and therefore the alternative treatment provided for in Section D.4 is applicable, and (6) any Allowed Unsecured Claim of Badger Capital if Badger Capital does not elect to accept the treatment proposed for it in Section B.5 and therefore the alternative treatment provided for in Section D.5 is applicable; provided, however, Class 6 specifically excludes any Allowed Unsecured Claims of the Forbearing Vendors included in Class 5 for which the Forbearance Agreements are assumed by Debtor as of Confirmation and assigned to Buyer.

Each Holder of an Allowed Claim in Class 6 shall receive the following Distribution from the Plan Fund on the Distribution Date: (a) cash in an amount equal to the lesser of (i) 20% of the amount of such Holder's Allowed Claim, or (ii) the pro-rata amount remaining in the Plan Fund after taking into account, the cash payment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, and the cash payments of all other Allowed Claims of Classes 1, 2, 4 and 5 that need to be paid (with adequate reserves being established for all of such Claims that have not been finally determined or otherwise allowed by the Bankruptcy Court as of the Distribution Date), or (b) such other, less favorable treatment agreed upon in writing by Debtor and the Holder of such Allowed Claim, in either case in full and final satisfaction of any Class 6 Claim held by such respective Holder.   In the event Debtor is required to establish any reserves as of the Distribution Date, any cash payments required to be made out of the Plan fund at the Distribution Date shall be made on a pro-rata basis, and Debtor will endeavor to pay the balance of the Distribution to the Holders of Allowed Claims in Class 6 as soon as practicable after the date such Claim becomes an Allowed Claim, subject to the final determination of Claims entitled to payment out of the Plan Fund, and such other order of the Bankruptcy Court, after resolution of the reserves held for the benefit of Holders of claims in other constituent classes.

**<u>Class 6 is an impaired Class and is entitled to vote on the Plan.</u>**

8.  <u>Class 7 - Interests</u>.

Class 7 consists of all Allowed Interests.  As of the Effective Date, all Interests, including all Old Equity Interests, shall receive nothing under the Plan.

- 40 -

**Class 7 is an impaired Class that is conclusively deemed not to have voted to accept the Plan pursuant to § 1126(g) of the Bankruptcy Code.**

ONLY CLASSES THAT ARE IMPAIRED UNDER THE PLAN ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  Section 1124 of the Bankruptcy Code provides that a class of claims or investor interests is considered to be impaired under a plan of reorganization unless the plan does not alter the legal, equitable and contractual rights of the holders of such claims or investor interests.  In addition, such classes will be considered impaired unless (i) all outstanding defaults, other than defaults relating to the insolvency or financial condition of Debtor or the commencement of the bankruptcy case, are to be cured and the holders of claims or investor interests in such classes are to be compensated for any damages incurred as a result of any reasonable reliance by such holders on any contractual provisions or applicable law to demand acceleration, or (ii) if such claim results from a non-monetary obligation, the holder of such claim is compensated for any actual pecuniary loss incurred as a result of such failure.

DEBTOR BELIEVES THAT CLASSES   2, 3A, 3B, 4, 5, 6 AND 7 ARE OR MAY BE IMPAIRED UNDER THE PLAN.

**D.** **Alternative Treatment for Rejecting Classes**

1.    General.

In the event that any impaired Class of Creditors or Holders of Interests shall fail to accept the Plan in accordance with § 1129(a) of the Bankruptcy Code, Debtor reserves the right to request the Bankruptcy Court to confirm the Plan in accordance with the provisions of § 1129(b) of the Bankruptcy Code.  In that event, any Class which is impaired by and does not accept the treatment provided in Article 4 of the Plan for that Class in accordance with the provisions of § 1126 of the Bankruptcy Code shall be treated in a fair and equitable fashion, and not be discriminated against unfairly, and shall be treated pursuant to § 1129(b) of the Bankruptcy Code, if so ordered by the Bankruptcy Court at the Confirmation Hearing.

In particular, the following alternative treatment for the Allowed Claims of (i) Wachovia, (ii) Blue Ridge, (iii) Geneva, and (iv) Badger Capital, is proposed by Debtor in Sections D.2, D.3, D.4 and D.5, respectively, in the event such Creditors do not accept the treatment otherwise offered them, but is subject to amendment or modification by Debtor, or such other treatment as may be ordered by the Bankruptcy Court.    For purposes of determining the Allowed Secured Claims of Wachovia, Blue Ridge, and Badger Capital, the following procedure will be implemented, subject to such modifications that may be ordered by the Bankruptcy Court:

(1)    A hearing shall be held by the Bankruptcy Court to determine the extent, priority and validity of the Claim and Lien of such non-accepting party.  Debtor shall be entitled to assert, in reduction of the allowance any such Allowed Secured Claim, all rights of Debtor under § 506(c) of the Bankruptcy Code.

(2)    If said Claim is allowed and the Lien is determined to be valid, then the respective holder of such Claim shall be entitled to an Allowed Secured Claim for the amount determined by the Court pursuant to §§ 506(a) and (b) of the Bankruptcy Code. Any balance of the Allowed Claim in excess of the Allowed Secured Claim shall be deemed an Allowed Unsecured Claim.  The Allowed Secured Claim and Allowed Unsecured Claim of such Holder shall be subject to the alternative treatment set forth in Sections D.2, D.3, D.4 and D.5 below, respectively.

2.    <u>Alternative Treatment of the Wachovia Allowed Claims</u>.

In the event that Wachovia does not accept the treatment proposed to it in Section C.2 for its Allowed Claims, Wachovia shall receive a promissory note, that will be assumed by the Buyer, payable quarterly in 84 equal monthly payments of principal and interest which shall accrue at the rate of 9% per annum for the amount of its Allowed Secured Claim as determined by the Bankruptcy Court in full and final satisfaction of its Allowed Secured Claim, and any remaining Allowed Unsecured Claim of Wachovia shall be included as an Allowed Claim in Class 6 and subject to the treatment provided for in Section C.7.

Wachovia will be entitled to a Lien on the Assets of Buyer to secure the Allowed Secured Claim of Wachovia, if any, assumed by Buyer which Allowed Secured Claim shall maintain the same order of priority as it had as of the Petition Date with respect to any other Creditor holding an Allowed Secured Claim against Debtor who has its Allowed Secured Claim assumed by Buyer pursuant to the Plan.  In addition, as a condition to receiving the alternative treatment provided for Wachovia hereunder, Wachovia shall (a) release any and all security interests it may possess against any of the Assets under the Wachovia Loan Documents, (b) release the Wachovia Guaranties, and (c) waive any claims it may have against any Person with respect to the Wachovia Claim, including any claims Wachovia may have under the Wachovia Guaranties.

3.    <u>Alternative Treatment for Blue Ridge Allowed Claims</u>.

In the event that Blue Ridge does not accept the treatment provided for it under the Plan as set forth in Section C.3 for its Allowed Claims, Blue Ridge shall receive shall receive a promissory note, that will be assumed by the Buyer, payable quarterly in 84 equal monthly payments of principal and interest which shall accrue at the rate of 9% per annum for the amount of its Allowed Secured Claim as determined by the Bankruptcy Court in full and final satisfaction of its Allowed Secured Claim, and any remaining Allowed Unsecured Claim of Blue Ridge shall be included as an Allowed Claim in Class 6 and subject to the treatment provided for in Section C.7.

Blue Ridge will be entitled to a Lien on the Assets of Buyer to secure the Allowed Secured Claim of Blue Ridge, if any, assumed by Buyer which Allowed Secured Claim shall maintain the same order of priority as it had as of the Petition Date with respect to any other

- 42 -

Creditor holding an Allowed Secured Claim against Debtor who has its Allowed Secured Claim assumed by Buyer pursuant to the Plan. In addition, as a condition to receiving the alternative treatment provided for Blue Ridge hereunder, Blue Ridge shall (a) release any and all security interests it may possess against any of the Assets under the Blue Ridge Loan Documents, (b) release the Blue Ridge Guaranties, (c) assign the Fragnoli Life Insurance Policy back to Debtor, and (d) waive any claims it may have against any Person with respect to the Blue Ridge Claim, including any claims Blue Ridge may have under the Blue Ridge Guaranties.

4.    Alternative Treatment for Geneva Allowed Claims.

        In the event that Geneva does not accept the treatment proposed to it under the Plan as set forth in Section C.4 for its Allowed Claims, Geneva shall have the amount of its Allowed Claim determined by the Bankruptcy Court which shall be included as an Allowed Claim for such amount in Class 6 and subject to the treatment provided for in Section C.7.

        In addition, as a condition to receiving the alternative treatment provided for Geneva hereunder, Geneva shall (a) release any and all security interests it may possess under any of the Geneva Loan Documents against any of the Assets, if any, (b) release any Guaranties of the Geneva Claim that may be in existence against any Person, and (c) waive any claims it may have against any Person with respect to the Geneva Claim.

5.    Alternative Treatment for Badger Capital Allowed Claims.

        In the event that Badger Capital does not accept the treatment proposed to it under the Plan as set forth in Section C.5 for its Allowed Claims, Badger Capital shall receive in cash from the Plan Fund on the Distribution Date the amount of its Allowed Secured Claim as determined by the Bankruptcy Court in full and final satisfaction of its Allowed Secured Claim, and any remaining Allowed Unsecured Claim of Badger Capital shall be included as an Allowed Claim in Class 6 and subject to the treatment provided for in Section C.7.

        In addition, as a condition to receiving the alternative treatment provided for hereunder, Badger Capital shall (a) release any and all security interests it may possess under any of the Badger Capital Loan Documents against any of the Assets, (b) release any and all Persons that guaranteed the Badger Capital Claim, and (c) waive any claims it may have against any Person with respect to the Badger Capital Claim.

**E.    Treatment of Executory Contracts and Unexpired Leases**

        Section 365(d)(2) of the Bankruptcy Code states that Debtor may assume or reject an executory contract or unexpired lease of residential real property or of personal property at any time before confirmation of a plan, but the Court, on the request of any party to such contract or lease, may order Debtor to determine within a specified period of time whether to assume or reject such contract or lease. Section 1123(b)(2) of the Bankruptcy Code states that a plan may provide for the assumption, rejection, or assignment of any executory contract or unexpired lease

- 43 -

not previously rejected.  The Plan contemplates the assumption of certain Executory Contracts and Unexpired Leases.

Section 365(d)(4) of the Bankruptcy Code provides that an unexpired lease of nonresidential real property under which Debtor is the lessee shall be deemed rejected if Debtor does not assume or reject the unexpired lease of nonresidential real property by the earlier of (i) the date that is 120 days after the order for relief (which in this Case is the Petition Date), or (ii) the date of the entry of an order confirming a plan.  The Court can extend the 120 day period in (i) above for 90 days on motion of Debtor or the lessor to the nonresidential real property lease for cause.   Currently, October 19, 2006 is the date by which Debtor must assume its Real Property Lease or it will be deemed rejected as of such date.   On September 13, 2006, Debtor filed a motion asking the court to extend the time period by which it must assume or reject the Real Property Lease for 90 days (the "Extension Motion") which, if approved by the Court, would extend the date by which Debtor must assume or reject the Real Property Lease until January 17, 2007.

1.    Assumption/Rejection of Nonresidential Real Property Lease.

Debtor shall file with the Bankruptcy Court on or before five (5) Business Days prior to the scheduled Confirmation Hearing (or earlier if the deadline to assume or reject the Real Property Lease is approaching) whether it intends to assume or reject the Real Property Lease on its facility in Canton, Georgia.    In the event that Debtor elects to assume the Real Property Lease, section 365 of the Bankruptcy Code requires Debtor to cure any default in existence under the Real Property Lease, the amount of which is subject to determination by the Bankruptcy Court.  Landlord has filed a proof of claim alleging that the cure amount may equal at least $598,000 (the "Real Property Cure Amount").  Debtor reserves the right to object to the proof of claim filed by the Landlord.   Debtor also asserts that it has certain claims in existence against the Landlord for failure of Landlord to provide services and/or required repairs under the Real Property Lease for which it is entitled to an offset, and believes that such amount may equal or exceed the Real Property Cure Amount.  Debtor intends to assert those claims in the Bankruptcy Court as an offset against the Real Property Cure Amount.  As a consequence, if Debtor elects to assume the Real Property Lease, at the Closing Buyer shall deposit $598,000 as an estimate of the Real Property Cure Amount into an escrow account maintained by Debtor's Counsel until such time as a Final Order of the Bankruptcy Court is obtained which determines the amount of the cure payment required, if any, that Debtor is required to pay to Landlord in order to assume the Real Property Lease.  Any portion of this escrow that is not required by order of the Bankruptcy Court to be paid to Landlord to cure any defaults under the Real Property Lease shall be refunded to Buyer.

2.    Executory Contracts and Unexpired Leases Not Assumed are Rejected.

Debtor shall file with the Bankruptcy Court on or before five (5) Business Days prior to the scheduled Confirmation Hearing a list of all Executory Contracts and Unexpired Leases (excluding the Real Property Lease discussed in E.1 above) that it expressly intends assume and assign as of the Effective Date.  Any Cure Payments required to be paid (excluding the Real

- 44 -

Property Cure Amount which is discussed in E.1 above) to the appropriate party shall be paid out of the Plan Fund. On the Effective Date, except for an Executory Contract or Unexpired Lease that is assumed and assigned pursuant to the Confirmation Order or rejected by an order of the Bankruptcy Court, each Executory Contract and Unexpired Lease of every kind and nature, including without limitation all warrants, options or other rights to purchase any equity securities of Debtor, that was entered into by Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms prior to the Confirmation Hearing, will be deemed, and will be, rejected pursuant to § 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumption and rejection of the Executory Contracts and Unexpired Leases as provided for in the Plan, pursuant to § 365 of the Bankruptcy Code, as of the Effective Date. Exhibit "B" to the Plan contains a list of the Executory Contracts and Unexpired Leases of Debtor that it believes are in existence as of the Petition Date. The failure to list an Executory Contract or Unexpired Lease on such Exhibit "B" shall not prejudice any party to an alleged Executory Contract or Unexpired Lease (including Debtor) from requesting that the Bankruptcy Court approve the assumption or rejection of such omitted Executory Contract or Unexpired Lease as provided for in § 365 of the Bankruptcy Code.

All damages, if any suffered by any person, corporation or other entity by rejection of any executory contract or unexpired lease must be evidenced by a proof of claim filed within sixty (60) days following Confirmation and, if allowed by the Court, will be treated as a Claim in Class 6.

**F.      Means for Implementation of the Plan**

1.      Sale of the Assets.

To implement the Plan, at the Closing, Buyer intends to purchase the Assets free and clear of any and all Liens, Claims, encumbrances, and Interests and shall (1) deliver to the Debtor cash in the amount equal to $3,300,000 (the "Cash Payment") for deposit in to the Plan Fund, (2) assume the balance of the Allowed Claims of the Holders of Class 5, subject to the respective Forbearance Agreements for such Holders that Debtor elects to assume and assign to Buyer (less cash amounts to be paid out of the Plan Fund to the holders of Allowed Claims in Class 5), (3) deliver to Debtor cash in the amount equal to the Real Property Cure Amount to be deposited by Debtor into an escrow account maintained with the Debtor's counsel for payment to the Landlord in the event the Debtor elects to assume and assign the Real Property Lease to Buyer, subject to any offset referenced in Section E.1 above, (4) deliver to Debtor cash in the amount necessary to cure any other Executory Contracts or Unexpired Leases (other than the Forbearance Agreements or the Real Property Lease) that Debtor will assume and assign to Buyer (pursuant to the Asset Purchase Agreement) for deposit into the Plan Fund, and (5) if Blue Ridge and/or Geneva accept their treatment offered under the Plan, issue one or more contingent promissory notes in an aggregate  maximum amount of $400,000. In addition, Debtor and Buyer shall execute such other documents as are reasonably necessary to effectuate the sale.

- 45 -

2.    <u>Plan Fund Establishment</u>.

The Debtor shall establish and maintain the Plan Fund by depositing the net cash proceeds from the sale of Debtor's Assets into a segregated, interest bearing trust account established and maintained by Debtor or its duly appointed disbursing agent.  The Plan Fund and all interest and other earnings on the Plan Fund shall be held for the exclusive benefit of Holders of Allowed Claims under the Plan.  Disbursements from the Plan Fund will be paid to Holders of Allowed Administrative Claims, Allowed Priority Claims, Allowed Claims of Class 1, Allowed Claims of Class 2, Allowed Claims of Class 4, Allowed Class 5 Claims, and Allowed Claims of Class 6, in each case as finally determined by the Bankruptcy Court after taking into account the treatment provided for in Article 4 of the Plan and, if appropriate, the alternative treatment in Article 5 of the Plan for the respective classes.

3.    <u>Objections and Establishment of Disputed Claims Reserve</u>.

All objections to Claims shall be filed by the Claims Objection Bar Date (and as such date may be extended by the Bankruptcy Court) or shall be forever barred. On the Effective Date, the Debtor shall establish the Disputed Claims Reserve for Disputed Claims in accordance with Article 7 of the Plan.

4.    <u>Delivery of Distributions; Undeliverable Distributions</u>.

(a) Subject to Section 7.5(c) and 7.5(d) of the Plan, distributions to Holders of Allowed Claims shall be made (1) at the address set forth on the respective Proofs of Claim filed by such Holders, (2) at the addresses set forth in any written notices of address change delivered to the Debtor after the date of any related Proof of Claim, or (3) at the address reflected in the Debtor's Schedules if no Proof of Claim has been filed and the Debtor has not received a written notice of a change of address.

(b) If the distribution to the Holder of any Allowed Claim is returned to the Debtor as undeliverable, no further distribution shall be made to such Holder, and the Debtor shall have no obligation to make any further distribution to the Holder, unless and until the Debtor is notified in writing of such Holder's then current address. Undeliverable distributions shall remain in the Plan Fund until such time as a distribution becomes deliverable, subject to Section 7.5(c) of the Plan.

(c) Any Holder of an Allowed Claim who does not assert a Claim for an undeliverable distribution within one (1) year after the Distribution Date on account of such Claim shall no longer have any claim to or interest in such undeliverable Distribution and such Holder's shall be forever barred from receiving any distribution under the Plan and the amount of such undeliverable distribution shall revert to the Buyer.

- 46 -

5.     Disputed Claims.

(a) No distribution or other payment or treatment shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim. No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

(b) On the Effective Date, the Debtor shall withdraw from the Plan Fund and deposit into the Disputed Claims Reserve the share of the Plan Fund for each Holder of a Disputed Claim, which share shall be computed as if the Holder's Disputed Claim were an Allowed Claim in its face amount. For the purposes of this provision, the "face amount" of a Claim is (1) the amount set forth on the Proof of Claim unless the Claim is filed in an unliquidated amount, (2) if a Proof of Claim has been filed in an unliquidated amount, an amount determined in accordance with Section 7.6(c) of the Plan, or (3) if no Proof of Claim has been filed, the amount of the Claim listed in the Schedules.

(c) As to any Disputed Claim for which a Proof of Claim has been filed in an unliquidated amount or for which a Proof of Claim has been filed that denominates the Claim as contingent, the Bankruptcy Court shall, upon motion by the Debtor to be filed on or before the Claims Objection Bar Date, estimate the maximum allowable amount, if any, of such Disputed Claim under § 502(c) of the Bankruptcy Code. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to this Section 7.6(c) irrevocably shall constitute and be a conclusive and final determination of the maximum allowable amount of the Claim of such Creditor, should it become an Allowed Claim. Accordingly, a Creditor whose Disputed Claim is estimated by the Bankruptcy Court pursuant to this Section 7.6(c) shall not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Creditor shall not have recourse to the Debtor or any Assets in the event the allowed amount of the Creditor's Claim is at any time later determined to exceed the estimated maximum allowable amount. In all circumstances, the Creditor's sole recourse for the payment of such Disputed Claim should it become an Allowed Claim shall be to the funds maintained in the Disputed Claims Reserve.

(d) Within ten (10) Business Days following the Allowance Date for each Disputed Claim that becomes an Allowed Claim after the Distribution Date, the Debtor or its duly appointed disbursing agent shall pay directly to the Holder of such Disputed Claim an amount equal to such Holder's share of the Plan Fund, which share shall be calculated using the allowed amount of such Disputed Claim and the amount on deposit in the Plan Fund as of the date amounts were withdrawn from the Plan Fund in respect of such Disputed Claim pursuant to Section 7.6(b) of the Plan.

6.     Bar Date for Objections to Claims and Interests.

Unless an earlier time is set by Final Order of the Bankruptcy Court, all objections to Claims or Interests must be filed with the Bankruptcy Court by the Claims Objection Bar Date; provided, however, that no such objections may be filed against any Claim or Interest after the Bankruptcy Court has determined that such Claim or Interest is an Allowed Claim or Allowed

Interest, as applicable, unless the order which allows such Claim(s) or Interest(s) is vacated, modified or reversed, on appeal or otherwise, or reserves the right to assert subsequent objections. The failure by any party in interest, including the Debtor, to object to any Claim or Interest, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's rights to object to, or re-examine, any such Claim or Interest, as applicable, in whole or in part for purposes of allowance.

7.    Disbursement of Funds.

(a)  The Debtor or its duly appointed disbursing agent shall make all distributions of cash required under the Plan. All cash and other property held by the Debtor for distribution to Creditors shall be held by it in trust for the exclusive benefit of the Holders of Allowed Claims, shall not be commingled with the general assets of the Debtor, and shall not be subject to any claim by any Person except as provided under the Plan. The Debtor or its duly appointed disbursing agent shall invest all cash to be distributed hereunder in accordance with § 345 of the Bankruptcy Code until such cash is distributed pursuant to the Plan.

(b)  Any amounts remaining in the Plan Fund or the Disputed Claims Reserve Fund that are not distributed to any Holder of a Claim pursuant to the treatment provided for in the Plan shall revert and be paid to Buyer as soon as practicable after all Claims are finally resolved.

8.    Direction to Parties.

From and after the Effective Date, the Debtor may apply to the Bankruptcy Court for an order directing any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property required under the Plan, and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan, pursuant to § 1142(b) of the Bankruptcy Code.

9.    Setoffs.

The Debtor shall, to the extent permitted under applicable law, setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim, the claims, rights and causes of action of any nature (other than preference claims) that the Debtor may hold against the Holder of such Allowed Claim which are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claims, rights and causes of action that the Debtor possess against such Holder.

10.   Special Distribution to Holders of Claims in Class 6.

Notwithstanding anything in the Plan to the contrary, the Holders of Claims in Class 6 shall be entitled, in addition to the treatment provided for in Section 4.7 of the Plan, to a pro-rata special distribution of any Assets remaining in the possession or control of Debtor that have not

- 48 -

otherwise been distributed pursuant to the Plan, including any Bankruptcy Recoveries, or Assets specifically excluded by Buyer pursuant to the Purchase Agreement, to a maximum of the Allowed Claim of each respective Holder.

## VIII.    PLAN ANALYSIS

### A.    Claims Analysis and Projected Distributions

1.    Unclassified Claims

(a)    *Administrative Claims.*  Debtor anticipates that all Allowed Administrative Claims including Claims for professional fees and expenses, net of retainers, if any, will be paid from the Plan Fund.  Debtor projects that at Confirmation, Administrative Claims will consist solely of amounts due to professionals retained by Debtor and the Unsecured Creditors Committee because all other obligations incurred by Debtor after the Petition Date relating to the ongoing operations of Debtor will be assumed by Debtor (except as may be limited or excluded in the Purchase Agreement).

(b)    *Priority Tax Claims.*  As set forth below, Debtor projects that there will be certain Allowed Priority Tax Claims as of Confirmation, each of which Claims Debtor shall pay in cash in full from the Plan Fund on the Effective Date of the Plan, unless the Holders of such Claims agree to different treatment.  Debtor, however, is unable to estimate the amount of these Claims as of this time because Debtor has continued operations and these amounts are being paid in the ordinary course.

2.    Classified Claims

The following is a summary of (i) the aggregate amount of Classified Claims that were listed by the Debtor in its Schedules, (ii) the aggregate amount of Claims as modified by proofs of claims filed in each Class of Classified Claims, (iii) the aggregate estimated amount of Classified Claims that the Debtor projects will become Allowed Claims and paid in the Case, and (iv) projected distributions (as a percentage) to be paid to Holders of such Allowed Classified Claims from the Plan Fund:

[Remainder of Page Intentionally Left Blank]

- 49 -

| Class | Description of Claims in Class | Aggregate Scheduled Amount of Claims in Class | Aggregate Estimated Allowed Amount of Claims in Class (1) | Aggregate Estimated Total Distributions for Claims in each Class (2) | Projected Percentage Distributions to Allowed Claims in each Class |
|---|---|---|---|---|---|
| 1 | Priority Non-Tax | $0.00 | $25,000 | $25,000 | 100.00% |
| 2 | Allowed Claim of Wachovia | $2,400,000 | $2,827,000 | $1,800,000 | 63.67% |
| 3A | Allowed Claim of Blue Ridge | $4,400,000 | $3,558,000 | $289,092 (3) | 8.10% |
| 3B | Allowed Claim of Geneva | N/A, included with Blue Ridge Claim | $1,365,000 | $110,908 (3) | 8.10% |
| 4 | Allowed Claim of Badger Capital | $250,000 | $247,000 | $150,000 | 60.72% |
| 5 | Allowed Claims of Forbearing Vendors | $2,000,000 | $1,698,000 | $1,698,000 (4) | 100.00% |
| 6 | General Unsecured | $1,800,000 | $1,973,000 (5) | $395,000 (6) | 20.00% (6) |
| 7 | Interests | N/A | N/A | None | 0% |

Notes:

(1) This column represents the estimated amount of Claims in the respective Class after taking into account proofs of claim that have been filed in this Case, prior to any review or determination by Debtor as to whether grounds exist to object to the amount of the Claim filed.

- 50 -

(2)    This column represents the estimated Distribution assuming that Creditors in Classes 2, 3A, 3B and 4 accept the treatment proposed by Debtor under the Plan and that any deficiency claims are waived so that no additional amounts are included in Class 6. If any of such Creditor Classes do not accept the Plan then Debtor will propose the alternative treatment provided for these Claims in Article 5 of the Plan (See Section VII.D) and some or all of the Claims noted for each respective Class may be included in Class 6,  All amounts will be paid out of the Plan Fund except as noted in notes (3) and (4) below.

(3)    These amounts represent the aggregate $400,000 contingent promissory notes proposed under the Plan for Holders of Class 3A and 3B and are allocated between Classes 3A and 3B based on the proportionate amount of their estimated Claims. The promissory notes will be assumed and paid directly by Buyer; therefore these amounts will not be paid out of the Plan Fund.

(4)    The Plan provides that the initial amount necessary to activate the Forbearance Agreements assumed by Debtor (approx. $565,000) will be paid out of the Plan Fund. The balance of the estimated Claims in Class 5 (approx. $1,133,000) will be assumed by the Buyer.

(5)    The Debtor makes no representations or warranties concerning the amounts available for Distribution or the ultimate amount paid to a Creditor in Class 6. The amounts available for Distribution to Holders of Claims in Class 6 are determined by numerous factors beyond the control of Debtor, including but not limited to the (i) the aggregate amount of Claims in Class 6 as a result of the ultimate treatment of Creditors in Classes 2, 3A, 3B and 4, and (ii) the amount actually available in the Plan Fund after taking into account the payment of Claims of Holders having a higher priority, and liquidation of any Bankruptcy Recoveries and other assets not acquired by Buyer, if any. Further, the aggregate amount of claims in Class 6 may fluctuate from the estimate of claims as of the Petition Date due to resolution of any objections that may be filed with respect to Claims.

(6)    The amount reflected represents 20% of the estimated Claims in Class 6. The Plan provides that Buyer will make a Cash Payment of $3,300,000 to the Plan Fund at Closing. The amount estimated to be paid to Holders of Class 6 appears reasonable based upon expected disbursements from the Plan Fund to other constituent Classes if they accept the treatment proposed under the Plan as follows:

| | |
|---|---|
| Cash Payment to Plan Fund from Buyer at Closing | $3,300,000 |
| Estimated Distributions From Plan Fund | |
| Unclassified Claims | $300,000 |
| Class 1 Claims | $25,000 |
| Class 2 Claims | $1,800,000 |
| Class 3A Claims | - |
| Class 3B Claims | - |
| Class 4 Claims | $150,000 |
| Class 5 Claims | $565,000 |
| Total Estimated Distributions From the Plan Fund | $2,840,000 |
| Available in Plan Fund for Class 6 Claims | $460,000 |
| Estimated Payout at 20% to Class 6 Claims | $395,000 |
| Difference Available | $65,000 |

- 51 -

The difference available represents the amount available for distribution to Holders of Class 6 Claims only if such amount is needed to bring Distributions to Holders in Class 6 to a maximum of 20% after taking into account the actual amounts of Claims in the Class, and may be adjusted depending on cash needed to be disbursed from the Plan Fund to Holders of Claims in other constituent classes. If any amounts remain from the Cash Payment from Buyer after Holders of Claims in Class 6 receive 20% of their Allowed Claims, such excess amount shall be reverted to Buyer. If additional amounts are included in the Plan Fund from other sources, such additional amounts will be available for a special distribution to Holders of Claims in Class 6 (See Section 7.11 of the Plan, and Section VII.C.10 of this Disclosure Statement) and may result in a recovery to Holders in Class 6 in excess of 20%. Due to the uncertainties of (i) the amounts necessary to pay other constituent Classes and (ii) the effect of any Bankruptcy Recoveries or the liquidation of any assets not acquired by Buyer, if any, Debtor is unable to represent the actual expected payout to Holders of Claims in Class 6.

## B.    <u>Liquidation Analysis/Alternatives to the Plan</u>

If the Plan is not confirmed, the theoretical alternatives include (1) liquidation of Debtor's Assets and business, or (2) an alternative plan of reorganization. In the opinion of Debtor, the Plan offers more to Holders of Claims than such Holders can expect to receive upon the liquidation of the Debtor's Assets. Pursuant to § 1121(b) of the Bankruptcy Code, only Debtor may file a plan for the first 120 days after the Petition Date (the "Exclusive Period"). Because Debtor satisfied this requirement, § 1121(c) extends the Exclusive Period for an additional 60 days thereby giving Debtor the exclusive right for a total of 180 days from the Petition Date to attempt to gain acceptance of, and confirm, its Plan. Debtor is currently in the Exclusive Period (which expires on December 18, 2006), therefore no other party is entitled to file a competing plan unless they first seek permission of the Bankruptcy Court and the Court for cause, after a notice and a hearing, elects to reduce the number of days in the Exclusive Period. Notwithstanding the existence of the Exclusive Period, Debtor is not aware of any other potential plan proponent or alternative plans of reorganization that would be made know to Creditors if the Exclusive Period were not in effect.

In evaluating whether to accept or reject the Plan, Creditors should compare the projected distributions on account of their Allowed Claims under the Plan to their probable recovery on such Claims if the Case were converted to a liquidation under chapter 7 of the Bankruptcy Code. In a chapter 7 liquidation, which is conducted by a trustee, the secured creditors will receive either the property on which they may have an unavoidable Lien or the proceeds from the sale of the Property, except to the extent of any surcharge for expenses of maintaining the Property under § 506(c) of the Bankruptcy Code (in the order of priority if competing security interests exist in such property).

Pursuant to the order of the Bankruptcy Court approving the post-petition financing with Harbert, Harbert was provided a priming lien to secure the post-petition financing, senior to all other creditors of Debtor. In addition the order also provided certain Professional Fee Claims and other specifically identified expenses of the United States Trustee a super-priority

- 52 -

administrative expense status that is to be paid as part of the post-petition financing, senior to all other Claims of Creditors. Upon liquidation these super-priority Claims will be paid first before any amounts are paid on the Claims of Debtor. If any unencumbered assets remain Claims of Creditors will be paid in the following order based on their priority: secured creditors (Badger in certain equipment, Wachovia, Blue Ridge), Administrative Claims Other than the Administrative Claims granted super-priority in the post petition financing order), and then Claims of Unsecured Creditors. Administrative Claims include the costs of liquidating the Assets as well as any compensation owed to the Chapter 7 trustee under § 326(a) of the Bankruptcy Code.

Debtor estimates that if the Case were converted to Chapter 7, a liquidation of its Assets would result in the generation of approximately $2,575,000 in cash for deposit into a liquidating trust account to be paid to Debtor's Creditors. The projected receipts from a liquidation of Debtor's Assets may be summarized as follows (See Section IV.C of this Disclosure Statement):

| | |
|---|---|
| Machinery, Equipment and Other Fixed Assets | $475,000 |
| Inventory | $150,000 |
| Accounts Receivable | $1,900,000 |
| Misc. assets | $50,000 |
| | |
| Estimated Liquidation Value (excl. cost of liquidation) | $2,575,000 |

Debtor projects that upon such liquidation, Harbert and the Holders of the super-priority Administrative Claims will hold approximately $1,300,000 in Claims and will therefore be paid in full from any liquidation. Badger Capital will have at best an Allowed Secured Claim for $150,000 which will be entitled to be paid before the Claims of other secured creditors. This would leave an estimated $1,125,000 to pay against the Wachovia Allowed Secured Claim. Because Wachovia asserts a Claim in excess of $2.8 million, it is highly likely that Wachovia will not have its Claims satisfied in full.

Consequently, if the Debtor's Case were converted to Chapter 7 of the Bankruptcy Code, and Debtor's assets liquidated, no unencumbered assets would be available for distribution from the estate to Holders of Allowed Claims or Interests in Classes 3A, 3B, 4, 5, 6, and 7. By contrast, under the Plan, (a) Wachovia will receive an estimated distribution of 63.67% of its asserted Claim, (b) the Holders of Allowed Claims in Class 3A and 3B will receive a distribution of approximately 8.10% of the estimated amount of their asserted Claims; (c) the Holders of Allowed Claims in Class 4 will receive a distribution of approximately 60.72% of the estimated amount of its asserted Claim; (d) the Holders of Allowed Claims in Class 5 will receive a distribution of 100% of the estimated amount of their Claims; and (e) the Holders of Allowed Claims in Class 6 will receive an estimated distribution of as much as 20.00% of the estimated amount of their Claims. In each case the percentage recovery will depend on the final amount of the respective Holders of Allowed Claims, and the recovery to Holders of Class 6 will depend on whether the alternative treatment for one or more of the Holders of Claims in Classes 2, 3A, 3B and 4 results in such Holders having an Allowed Unsecured Claim included in Class 6.

C.    **Feasibility Analysis**

The sale of the Assets to Buyer provides sufficient funds to make all payments due under the Plan. Such amounts will be paid at the Closing into the Plan Fund and Distributions shall be made from the Plan Fund as provided for in the Plan. Accordingly, the Plan is feasible.

D.    **Tax Consequences**

The tax consequences resulting from Confirmation of the Plan can vary greatly among the various Classes of Creditors and Interests, or within each class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local and foreign tax statutes. Because of the complexity of the transactions contemplated by the Plan, the differences in the nature of the Claims of various Creditors, their taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences of the transactions, the following discussion of tax consequences is intended to be general in nature only. No specific tax consequences to any Creditor is represented, implied, or warranted. Each holder of a Claim or Interest should seek professional tax advice, because recent changes in taxation are complex and lack authoritative interpretation.

**DEBTOR ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS AND INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN TO THEIR INDIVIDUAL SITUATION.**

IX.    **SOLICITATION OF ACCEPTANCES; CONFIRMATION HEARING**

Although this Disclosure Statement provides information regarding the assets, liabilities and general financial posture of Debtor and the potential benefits that might accrue to Holders of Claims and Interests in Debtor upon Confirmation of the Plan, the Disclosure Statement neither guarantees nor purports to represent the amount or percentage of each Allowed Claim that would be realized under the Plan. Despite this uncertainty, which is inherent in any Plan, Debtor believes that the Plan will provide each Holder of a Claim with an opportunity to receive greater benefits than would be received by liquidation of Debtor's Assets either in a Chapter 7 case or otherwise.

As explained more fully hereinabove, before the Plan may be confirmed by the Bankruptcy Court, the Court must find that the criteria set forth in the Bankruptcy Code have been met, including the requirement that the Plan be accepted by an impaired Class. Debtor believes that the Plan is in the best interest of Holders of Claims and accordingly, Debtor strongly recommends that you vote for acceptance of the Plan.

- 54 -

As noted above, Class 1 is not an impaired Class of Creditors. Consequently, all Creditors holding Allowed Claims allocated to Class 1 are conclusively deemed to have accepted the Plan pursuant to § 1126 of the Bankruptcy Code.

Classes 2, 3A, 3B, 4, 5 and 6 are impaired Classes of Creditors. Consequently, each Creditor holding an Allowed Claim allocated to Class 2, 3A, 3B, 4, 5 or 6 shall be entitled to vote on the Plan.

The Bankruptcy Court will conduct the Confirmation Hearing after notice to Creditors and parties in interest as required by law. At the Confirmation Hearing, parties with objections to Confirmation of the Plan will be entitled to appear and be heard, and the Bankruptcy Court will determine whether the Plan meets the requirements of the Bankruptcy Code for Confirmation. These requirements include a finding that the Plan is feasible, which requires a finding that funding be sufficient to discharge the Debtor's obligations under the Plan and that Confirmation is not likely to be followed by a subsequent bankruptcy filing.

## X.  CONCLUSION

Debtor submits that Confirmation of the Plan represents the best means available for maximizing the value returned to Creditors and strongly recommends that Creditors vote in favor of the Plan.

A ballot for acceptance or rejection of the Plan is enclosed. **IT IS IMPORTANT THAT YOU VOTE.** You are urged to sign, date and mail your ballot as soon as practicable for purposes of counting your vote. **All BALLOTS MUST BE RECEIVED BY THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, AT ROOM 1340, RICHARD B. RUSSELL FEDERAL BUILDING, 75 SPRING STREET, ATLANTA, GEORGIA 30303, ON OR BEFORE ____[TBD]____ AT 5:00 P.M. PREVAILING EASTERN TIME TO BE COUNTED.**

**[Signature on Next Page]**

**[Signature Page of Disclosure Statement]**

Respectfully submitted this September _**28**_ , 2006.

Aerosol Packaging, LLC

By: _Leigh A. Fragnoli_
Leigh A. Fragnoli
President and Chief Executive Officer

Brian L. Schleicher
Georgia Bar No. 629321
Jampol, Schleicher, Jacobs & Papadakis, LLP
11625 Rainwater Drive
Suite 350
Alpharetta, GA 30004
(770) 667-1290

Counsel to Debtor

Aerosol Disclosure Statement for Plan.5.2.5.3.DOC